Booth, Judge,
delivered the opinion of the court:
On February 7, 1905, the claimant, George B. Spearin, entered into a written contract with the defendants to furnish the materials and do certain construction work which was intended to finally result in the completion of a dry dock at the New York Navy Yard. All the work incident to the undertaking was provided for by plans and specifications prepared by the Bureau of Yards and Docks, and the contract itself was signed by Mordecai T. Endicott, chief of said bureau, as the representative of the United States.
Congress by the act of June 7, 1900, had authorized the building of the dry dock and made an appropriation therefor. Previous to the advertisement for bids the Government officers in charge of the proposed work had agreed upon a location for the dry dock that embraced within its territorial limits a 6-foot intercepting brick sewer, and the same *165 appeared in the plans and specifications. This brick sewer extended clear across the site of the dock near the head thereof and was a part of the sewer system of the city of Brooklyn. Alongside the eastern limits of the site as fixed by the contract was another brick sewer 7 feet in diameter, the two sewers intersecting each other at a point southeast of the proposed dock entirely outside the contractor’s lines of operation fixed by the contract.
The contract provided for what was obviously indispensable, i. e., that the contractor should first divert the 6-foot sewer around the head of the dock upon the arc of a circle, thus removing it from interference with the building of the dry dock and as a menace to the completed work. The work to be done on the sewer was provided for by the defendants in plans and specifications prepared and furnished the contractor by the defendants. The sewer work was done by the plaintiff in strict accord with the contract, was inspected, accepted, and paid for by the defendants in the manner pro-id ded in the contract. The plaintiff assembled his plant and necessary materials and began work on the construction of the dry dock proper. The contract work proceeded in the usual way until August 7,1906, on which date a sudden and heavy downpour of rain occurred, which, in conjunction with a high tide, caused the 6-foot sewer previously constructed by the plaintiff to burst, the disaster being of sufficient consequence to flood that portion of the excavation already completed by the plaintiff and endanger future work if the sewer remained in its present condition. The plaintiff immediately stopped work and notified the defendants that he would not resume until the Government made some provision for caring for or assuming the responsibility for damages that had been or might hereafter be occasioned by said sewers. An investigation of the surroundings disclosed the following indisputable facts: It was a matter of knowledge, known generally by persons living in the navy yard and territory immediately adjacent thereto, that the sewerage system in this particular locality was seriously inefficient. For a number of years preceding this occasion, under exactly similar circumstances, these very sewers in the navy yard *166 had overflowed, blowing the iron tops off catch basins and manholes and flooding the yard itself with water to a considerable depth. The officers and men of the navy yard and the officers of the city of Brooklyn in charge of sewers knew it and had known it for years. The officer in charge of the dry-dock construction work knew it and had known of it for a considerable time before this contract was let.
Inside the 7-foot sewer, heretofore described as to location, a brick dam 5 or 5| feet high had been built several years before the contract for the dry dock was let, which, in conjunction with some small drain pipes installed at its mouth, diverted a large volume of sewage into the 6-foot intercepting sewer, reducing its capacity at least one-third and taxing its resisting strength beyond the maximum. This dam was not shown on any of the blue prints or plans exhibited to the contractor and appears to have been unknown to any of the parties to the contract. It was, of course, beneath ground and unobservable and had doubtless been constructed by the defendants to do the very thing it did do, divert the sanitary sewage which should have passed through the 7-foot sewer into the 6-foot sewer. Governmental surroundings in close proximity to the mouth of the 7-foot sewer sustains an inference that the dam and the small drain pipes were designedly prepared to take care of the offense likely to be occasioned by the great amount of sewage certain to be deposited in Wallabout Basin. Both sewers were built of brick, and brick sewers are not designed to resist internal pressure. The plaintiff made no inquiries respecting the efficiency or inefficiency of the sewers or sewerage system, nor was he informed by anyone at the navy yard or in any wise connected with this contract about the same; he visited the site of the work and made an examination of the same; there was nothing from external appearances to warn him of this condition of overflow. Whether Admiral Endicott knew of this condition does not appear, as he was not called as a witness. Other bidders had been so informed. The defendants declined to care for the broken sewer or amend the contract in any way. They insisted upon its strict performance, and after a most voluminous *167 correspondence, annulled the plaintiff’s contract, took possession of his plant and materials, and subsequently turned them over to another contractor. The dry dock was finally constructed by the Holbrook, Cabot & Rollins Co. Congress subsequently enlarged the appropriation very materially and a structure of larger proportions resulted. The 6-foot sewer which had caused all the controversy was finally cared for by plans and specifications proposed by the defendants; it was removed from the site of the work; its exposed ends made water-tight by reinforced concrete bulkheads and sluice gates, and no water passed through it during the construction of the dry dock. After the completion of the dock it was rebuilt in the manner set forth in Finding XIII, from new plans and specifications, which resulted in a new sewer of entirely different materials and construction designed to overcome and forestall the recurrence of a disaster similar to the one of which plaintiff complained. This suit is to recover damages for the annullment of the contract, alleged in the petition as amounting to $250,767.73, two items being involved, a balance of $144,839.56 due on account of funds actually expended in the conduct of the work over and above all sums received therefor, and $105,928.17 profits.
The court is not in agreement, objection being made to both the conclusion and the findings of fact. Particular objection is made to the last paragraph of Finding X and all of Finding XIII. The task of deducing findings of fact from a voluminous and contradictory record is not only a difficult one, but an extremely important function of this court. It is said that the last paragraph of Finding X states a conclusion and not a fact. The distinction between an ultimate fact and a conclusion is frequently a very narrow one where the court is charged with the necessity of reporting the former and omitting the latter. The rules of the Supreme Court expressly exclude the appearance of any testimony in the findings and require the court to report the facts established by the evidence, in the nature of a special verdict. The finding objected to states a fact; it is true that it is the statement of a fact arrived at from the record. The testimony of witnesses introduced, the detail condition of *168 affairs disclosed after the break in the sewer, the amount of water in the excavation, and the damages caused by the break were all considered in making up what we find to be a fact, an ultimate fact—i. e., “ it was unsafe to the contractor’s and the Government’s property for the contractor to proceed with the sewer in its then condition.” We might have recited in detail the manifold results of the break and set forth with particularity the depth of the water projected into the excavation, the movement of the piles and sheeting installed to sustain the banks, and given the evidence in the record, but one fact insisted upon as established by the record is the fact found in Finding X.
In the case of Ripley v. United States, 220 U. S., 491, and 222 U. S., 144, two orders of remand were entered by the Supreme Court directing this court to find specifically upon the question of good or bad faith—not bad faith in the sense of purposed wrongdoing, but bad faith as a fact deducible from the record before us. It is extremely important in this case to know as a fact whether the contractor could have proceeded with his work with safety to his property and the Government’s property in his care and custody. Any verdict rendered in this case ignoring this fact would fall of its own weight, and unless the record in all its detail is to be reviewed it seems an indispensable proceeding to set forth as a fact that which the record convinces the court sitting as a jury is a fact. De Groot v. United States, 5 Wall., 419; United States v. Adams, 6 Wall., 101; Mundy v. United States, 35 C. Cls., 265; Atlantic, Gulf Pacific Co. v. United States, No. 25293.
The Supreme Court of California in Levins v. Rovegno, 71 Cal., 273, concludes a discussion upon the question of ultimate facts with this very significant statement: “ Where, in legal proceedings, from the facts in evidence, the result can be reached by an exact process of rational reasoning adopted in the investigation of proof, it becomes an ultimate fact, to be found as such.”
It is not by this finding intended to ascribe liability to any of the parties for the event which brought on this condition, nor does the court undertake to say that plaintiff could not *169 have repaired the sewer and proceeded with his contract. The paragraph is limited exclusively to a fact which goes alone to the question of the right to cease work after the break—the right to abandon the contract—and is of paramount importance in this respect. That the finding is supported by the record seems quite beyond dispute; in fact it is so apparent that no officer of the Government thought of such a thing as a continuance of the contract work without the sewer being fully repaired or rebuilt. It would be utterly absurd to have done otherwise.
As to Finding XIII, it is asserted that the same deals with facts irrelevant and inadmissible because ex post facto in their relation to the issue involved. It is manifest that the finding is predicated wholly upon what occurred in reference to the construction of the dry dock after plaintiff’s contract had been annulled by a different contractor under another contract. With a most singular inconsistency the defendants call the members of this contracting company as witnesses to prove by them that the plaintiff could not have possibly constructed the dry dock called for in his contract under the plans and specifications furnished him by the defendants in any other manner than the way employed by it in completing the dock. Every witness so called predicates his opinion from personal experiences gained in the execution of this contract of the Holbrook, Gabot & Rollins Co., and unhesitatingly ascribes a great money loss to the undertaking as assumed by the plaintiff jn his contract. Yet when what the defendants did in taking care of the sewers and the detail of place and specification with reference to this most important feature of the whole undertaking is offered, it is insisted upon that the transaction is entirely disconnected with the former contract. The plaintiff’s contract was annulled, his plant and property seized, and the reason assigned for the annulment was his unwillingness to proceed with the work. His unwillingness to proceed is ascribed wholly to the broken sewer and the circumstances causing its break. This constitutes the gist of the whole case. The right of annulment is not an arbitrary one; it can not be exercised capriciously, and courts have the right to investi *170 gate the exercise of the right. Surely it is of extreme importance to know what the defendants did with reference to the sewer, especially so when the work is being done with plaintiff’s plant and constructed in part out of his material. Can it be that the defendants in one contract can seek refuge under an express right of forfeiture exercised because of certain conditions, and then subsequently, in dealing with the identical subject matter under exactly similar conditions with property and materials in which the first contractor has an interest, repudiate and reverse the injurious course first pursued to the benefit and advantage of the later contractor? If it was right in the final instance to design a sewer impervious to internal pressure after the stoppage in the 7-foot sewer had been removed, is it not a matter of vital import to a court or jury to have before it some explanation for this inconsistent conduct in not a disconnected but a continuous dealing with the same subject matter mentioned in this plaintiff’s contract, and which is the sole issue upon the point of liability in the case?
In Ceballos & Co. v. United States, 214 U. S., 47, the Supreme Court considered, although not set forth in the findings of this court, what was done and what construction was given to an earlier contract of similar terms and subject matter to the one involved by the officers of the Government, and a substantial judgment was awarded the plaintiffs. In the Ceballos case the same inconsistencies appeared as here. Upon one contract one course was pursued by the defendants ; under another affecting similar interests in a like manner another method was adopted.
The first paragraph of the specifications expresses in plain terms that the intention of the defendants in making the contract is to secure the construction of a dry dock complete in all its parts. It is elementary that the intention of the parties to a contract and the work that is required thereunder is to be gathered from the instrument as a whole. The verbiage employed in one section can not standing alone determine this question if from an examination of the entire agreement the language of said paragraph contradicts other provisions. The contract in suit was intended to secure in *171 the end the construction of a dry dock complete in all its parts, but it also included within its terms the construction of a new 6-foot sewer, not as an independent undertaking to be paid for separately, but out of the lump sum fixed by the terms of the contract for all the contractor was to do. The construction of the 6-foot sewer was just as much a part of the contract as any other work designed by its terms, and the obligations resting upon the contractor were just as great with reference thereto as they were to any other part of the work. The defendants made express provisions whereby the contractor assumed the task of removing all other obstructions from the site of the work. They might well have included the 6-foot sewer; not having done so, but expressly providing by exact and precise plans and specifications from which the contractor could not depart under peril of forfeiture and annulment of his contract, together with the withholding of his pay, it became incumbent upon defendants to provide for an adequate sewer. This proposition seems obvious. If the defendants had failed in the plans and specifications provided by them for the dry dock proper, and the contractor in following them could not have completed a work they were designed to accomplish, surely the responsibility for the failure would not rest upon him. The contractor is obligated to do what the plans and specifications direct him to do, and when he has done so in a good and workmanlike manner he has discharged his responsibility under the contract. If the plans and specifications are deficient, if they are inadequate and structurally wrong, it is the fault of the parties proposing them and not the contractor executing the same. The judgment and skill of the contractor is relied upon by the defendants to the extent only of executing the plans as they design them. Neither the contractor’s previous experience nor his general knowledge with reference to the character of the work is sought by the defendants in laying out the scope or detail of the same. He is expected to do the work in the manner and form prescribed by his employers, and if he fails, innumerable provisions of the very strictest character reserve ample protection for such failure to the defendants. In 6 Cyc., 63, the *172 relationship between builder and architect employed by the building owner is most concisely stated as follows :
“ Where the builder performs his work strictly in conformity with the plans and specifications, he is not liable for defects in the work that are due to faulty structural requirements contained in such plans and specifications, and may recover under the contract; nor is he under any responsibility, in the event of the subsequent destruction of completed work, whether that destruction is caused by its own inherent weakness or from extraneous causes * *
In Bentley v. State, 73 Wis., 416, a case strikingly similar to this is exhaustively treated by the court. In that case the contractor engaged to construct two new wings to the State capitol building at Madison, Wis. The work was to be done in strict accord with plans and specifications prepared by an architect employed by a board of commissioners provided for in an act authorizing the contract. The contractor had partially completed his work; all that he had done had been inspected, accepted, and paid for, when suddenly the wall collapsed and fell. The commission thereafter employed additional architects, modified the plans and specifications, and the contractor finished in a satisfactory manner the work at the request of the State. It was shown that the plans and specifications were inefficient. The State declined to pay the contractor for the fallen wall. In giving the contractor a judgment for the full amount claimed, the court said:
“Under the contract it is very manifest that, had the plaintiffs departed from such plans and specifications and refused to follow the directions of the architect, there could have been no recovery for the building of the south wing, even had they in the first instance built it as they were finally directed by the architect to do. On the contrary, they could only recover by furnishing materials and doing the work according to such plans, specifications, and directions as they allege they did. The fall was not the result of inevitable accident, as in several cases cited by counsel.”
The case of Moore, Receiver, v. United States, 46 C. Cls., 139, is the nearest approach to an exact condition with the case at bar. In the Moore case a break occurred in a cofferdam constructed by the contractor under plans and specifica *173 tions furnished him by the United States. In rendering judgment for the damages occasioned the contractor because of the break, the court said:
“Numerous cases to the same effect might be cited, and we believe the rule in cases of this character to be that where a contractor constructs a work under a contract which provides that it shall be done under the direction and supervision of an engineer appointed by and under the employ of the owner, and loss occurs to such contractor by reason of defects in the plans directed to be followed by such engineer, of a character which ordinary skill would have foreseen, the owner should pay for such loss.”
The defendants accepted a substantial judgment against them on this item of the claim, no appeal from the decision was taken, and the judgment was paid. It is true that in the Moore case the contractor reconstructed the cofferdam and finished his work, contenting himself with suit after the conclusion of the contract. In this case, however, the situation was the opposite. The contractor interposed no objection to a mere repair of the sewer; that in itself was comparatively insignificant. What he asked for, and what was refused him, was an assurance that the defendants would assume responsibility for damages to a continuing menace, an apparent, open, and notorious danger to property of great money value, a loss which might ruin him. In the Moore case the contractor could well repair the cofferdam and proceed, for it was an indispensable adjunct to doing the subsequent work prescribed by the contract. In this case the menace remained a source of danger to all the contractor might subsequently do, notwithstanding the fact that he might repair or rebuild the same. The defendants in this case not only declined to suggest a method or propose plans and specifications for averting the danger by reconstruction but positively asserted a liability upon the contractor not only for all that had happened but for all future loss as well.
In MacKnight Flintic Co. v. Mayor, 160 N. Y., 72, the court, in passing upon a suit to recover for work done according to plans and specifications furnished by the defendant, wherein a warranty appeared that the construction would produce certain water-tight floors, the court said: “The reasonable construction of the covenant under con *174 sideration is that the plaintiff should furnish the materials and do the work according to the plans and specifications, and thus make the floors water-tight, so far as the plans and specifications would permit.” The case is apropos, and the opinion collects and cites with discriminating care all the authorities upon the subject.
This principle of law is fully affirmed in Horgan v. Mayor, etc., 160 N. Y., 516; McRitchie v. City of Lake View, 30 Ills. Appellate, 393; Filbert v. City of Philadelphia, 181 Pa. State, 530; 1 Parsons on Contracts, 587.
The defendants assail the applicability of the above citations and predicate their criticism upon a difference in the relative situation of the parties, it being insisted that all the cases cited were suits to simply recover for work and labor done and materials furnished in accord with the contracts and specifications, conceding in the argument that an action could be maintained by the contractor in this case for the full cost of building the 6-foot sewer even after the break. It will be impossible to cite a case on all fours with the one in suit, and no such citation is to be found in the briefs of counsel. The issue must be determined by resort to fundamental principles of law abstracted from judicial determinations wherein the facts come within the range of similarity. If the contractor can recover the contract price for constructing the sewer, he must do so on the theory that he has complied with his contract, and it is difficult to perceive a distinction in law which rewards the contractor for his contract work and at the same time holds him responsible for damages occasioned by a defective design of the work he has admittedly performed in the only possible way he could do it and get pay therefor.
Again, it is insisted that the peculiar situation here removes this case from the rule above stated. The contractor not only assumed the risk to be anticipated from the location of the sewer, but from breakage and disaster as well; that he was given ample warning by the terms of the contract to investigate conditions for himself, and having assumed an obligation to do the work he must perform it, no matter how difficult, expensive, or dangerous it may be to complete his *175 contract. Defendants’ contention would be forcible, if not unanswerable, if the disaster here complained of was the result of inevitable accident. The cause of the break in the 6-foot sewer is the pertinent inquiry in the first instance. The court concedes the contractor’s obligation to do the work irrespective of difficulties encountered, unless prevented from so doing by the act of God, the law, or the other party, and inevitable accident does not come within the exceptions. The findings disclose positively, and from them an irrefutable inference follows, that the break in the sewer was not an inevitable accident; it was, in fact, not an accident at all in the legal signification of the term. The condition of the sewerage system of the navy yard was known to the defendants’ officers to be seriously inefficient for years before the contract was let. Actual knowledge of this condition is brought directly home to Mr. Hollyday, the defendants’ officer in charge of this work. The rain and the tide which caused the overflow were not unusual in the sense of a flood; it was to be expected and not out of the ordinary for that season of the year. There was no engineering difficulty in the way of caring for the volume of water which burst the 6-foot sewer and nothing in the surroundings which could possibly divert the attention of a prudent man with knowledge from anticipating the events which did happen. The 5-foot dam in the 7-foot sewer, a factor to which we might well ascribe the cause for the whole disaster, does not appear to have been known to any of the parties directly concerned with this contract. Who put it there must be left to inference also. It was not shown on any of the plans, specifications, or blue prints exhibited to the contractor, and was located entirely outside the territorial limits prescribed by the defendants for the contractor’s work, and aside from connecting the 6-foot sewer with the 7-foot sewer the contractor had nothing to do therewith. The contractor himself visited the site of the dock and supplemented his personal visit by sending two of his representatives to do likewise. Neither the contractor nor his representatives was ever informed as to the inefficiency of the sewerage system, although the defendants knew of it. The defendants say *176 that it was the duty of the contractor to see for himself whether he could perform the contract, and that in the exercise of common prudence he should have informed himself of all the particulars connected with the contract, and that where the means of knowledge is open and at hand and nothing is done to prevent him from using them, especially if he undertakes a personal examination, he can not be heard to complain. It is said that the Government did not guarantee the integrity of the sewers. In support of these contentions, among other cases cited, reliance is had upon the case of Simpson v. United States, 172 U. S., 372. There is a plain distinction between the Simpson case and this one. In the former case the contractor obligated himself by the terms of the contract to do the work which resulted so injuriously because of quicksand beneath the surface of the soil to be excavated, i. e., the Government selected the site and on this site he agreed to construct a dock. Whatever difficulties he encountered in the way of natural conditions were, of course, to be anticipated. The Government did not guarantee the character of the soil, and made no provisions in the contract with respect thereto, simply designating the same as available. In the case at bar the defendants specifically undertook the responsibility for diverting and rebuilding the 6-foot sewer and prescribed in detail the exact way in which the contractor should proceed. This case is more like the case of Sickels v. United States, 1 C. Cls., 214. The contractor here was not allowed to suggest the plan; the difficulty in the way of proceeding was obvious; the situation was apparent, and, as before observed, the defendants might have imposed the burden of obviating it upon the contractor, but they chose to assume it themselves.
Knowledge as a factor in fixing liability under contractual relations is not to be alone imputable to the contractor. The duty of both parties to the contract under a clause directing the contractor to visit the site and see for himself is mutual. The defendants can not withhold important information or mistakenly state what they do know and acquit themselves of liability under this precautionary clause usual in all Government contracts. Hollerbach v. United States, 233 U. S., 165; Christie et al. v. United States, 237 U. S., 234.
*177 The findings show that the defendants did know of the condition of the sewers, for they disclosed the same to some bidders and withheld it from the plaintiff. In Wilson v. Wall, 6 Wall., 83, the Supreme Court, in speaking of constructive notice sought to be imputed to a bona fide purchaser of lands for value, cited approvingly from Sugden on Vendors the following quotation:
“ When a person has not actual notice he ought not to be treated as if he had notice unless the circumstances are such as enable the court to say not only that he might have acquired but also that he ought to have acquired it but for his gross negligence in the conduct of the business in question. The question, then, when it is sought to affect a purchaser with constructive notice is not whether he had the means of obtaining and might by prudent caution have obtained the knowledge in question, but whether not obtaining was an act of gross or culpable negligence.”
What was there upon the site visible to inspection and open to investigation to charge the contractor with knowledge of an abnormal condition with respect to the sewers or suggest to him the pertinency of public inquiry in reference thereto? The site itself was more or less covered by buildings, which the contractor was to remove. Practically every description of interference beneath the surface of the earth was to be cared for by the contractor himself upon his responsibility except the building of the 6-foot sewer. The sewers were beneath the ground, there was absolutely nothing apparent, and nothing except an immediate occurrence of a rain similar to the one which did occur to even remotely suggest the subsequent disaster. All these interferences suggested, of course, difficulties in the skill and workmanship required to remove them and the cost thereof, but nothing as to the inherent structural weakness of a sewer the defendants would only allow him to remove and construct in a fixed and certain way.
What contractor would have gone among the native population making inquiry as to the internal capacity of sewers in the face of these express provisions in his contract, viz:
“ 5. Control of work.—The United States, by its civil engineer in charge of the work or other authorized representa *178 tive, shall at all times have full control and direction of the work under the contract, and all questions, disputes, or differences as to any part or detail thereof shall be decided by such civil engineer or representative, subject only to appeal to the Chief of the Bureau of Yards and Docks.
****❖&#
u 159. Back fill for sewer.—No back filling shall be deposited upon the sewer until after the coat of cement mortar has been allowed twelve hours in which to set. In depositing back fill in the sewer trench care shall be taken not to injure this coating in any way. No material shall be dumped from buckets or otherwise directly over the arch except as directed by the civil engineer in charge. Ashes and cinders, together with dry earth and loam from the line of the trench, may be used for back filling. It is believed that such material may be obtained in the vicinity free of cost to the contractor, but the Government does not assume any responsibility in connection therewith.
ijs # # # if: *
SEWER.
“ 196. Sewer.—The intercepting sewer in Dock Street, which now crosses the dock site, shall be diverted around the head of the dry dock, as shown on sheet 3. The new sewer shall have a uniform grade. Should either of the manholes now in the sewer be tom out in rebuilding it, they shall be rebuilt in the new sewer in a manner to correspond with the present manholes. All transverse sewers and drains that now empty into the present sewer on Dock Street and which are disturbed shall be rebuilt so as to empty into the new sewer, as directed. Those portions of streets torn up for constructing the sewer shall be refilled and rammed, as specified herein.
“ 197. Platform.—The piles shall be capped transversely with 8 by 12 inch sound spruce timbers, secured to each pile by one f by 20 inch galvanized steel driftbolt. On these «ball be laid 4 by 12 inch spruce planking, close together, and fastened to each cross cap by two 9-inch wharf spikes to each plank.
“198. Curves.—Whenever the sewer deviates from a straight line such deviations shall be true arcs of circles. The templets for the inverts shall be so arranged and the centers so constructed as to conform accurately to the given radii.”
*******
The court can not indulge a presumption, in the face of numerous decisions to the contrary, that the defendants in *179 embarking on a great and expensive enterprise like the one here involved designed an important and integral part of the great work with careless disregard of the structural capacity of its plans and specifications, leaving to a contractor the ascertainment of latent defects by asking for information he has every reason to believe the defendants knew and considered. Is nothing to be taken for granted by the contractor from the terms of an agreement that designates in minute particulars what he shall do and how it shall be done? Are Government plans and specifications prepared by its efficient and experienced engineering corps to be treated as so generally precarious that they must be substantiated as to good or bad engineering by inquiries as to local atmospheric conditions and rainfall? Is gross carelessness and imprudence to be charged against a contractor in his dealings with the United States because he accepts without inquiry the engineering skill and ability of Government engineers ? Who was in the best position to know of local conditions—the defendants or the plaintiff? There can be but one answer. Who was at fault in the premises? The defendants knew, as before observed, and while perhaps not intentionally withholding the knowledge, the effect is the same. The dam in the 7-foot sewer, like the sewer itself, was on Government property, with which the plaintiff had but temporary concern, and that was to attach the 6-foot sewer to the 7-foot one. It was placed there for the benefit of Government interests, viz, to preserve healthful conditions near Wallabout Basin. There was no way open for the plaintiff to detect its presence unless called upon to do absurd thing's. It was carelessly omitted from any record of the sewerage system, and its entire absence from the records of the general sewerage system of the city of Brooklyn sustains an inference that it could not have been the work of said city.
As Mr. Justice Day said in the Hollerbach case, sufra, p. 172:
“ We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which the specifications furnished by the Government as a basis of the contract left in no *180 doubt. If tbe Government wished to leave the matter open to independent investigation of the claimants it might easily have omitted the specification as to the character of the filling back of the dam. In its positive assertion of the nature of this much of the work it made a representation upon which the claimants had a right to rely without an investigation to prove its falsity.”
No loss followed from the mere location of the sewer; it was properly constructed and supported; the record finds the loss ascribable wholly to inherent defects in engineering, inefficient plans and design, a fact fully corroborated by the subsequent conduct of the defendants in caring for this same sewer. Sundstrom v. State of New York, 213 N. Y., 68.
The defendants by their plans and specifications warranted their efficiency and the contractor had a right to rely upon them as correct representations of good and sufficient engineering skill and ability without an independent investigation of previous local conditions which might have warned him otherwise. He can not be held to have assumed the risk in any event for an obstruction in a sewer entirely outside the lines of his contract work, and which he had no means of discovering in the ordinary discharge of his contractual duty. The defendants were bound to furnish him workable plans to accomplish the desired end. They were likewise bound to furnish plans that allowed him to prosecute his work without loss, damage, or delay due to their mistake; and if by reason of their error the contractor could not proceed without the danger of not only loss of all his profits, but destruction of his and Government property as well, he may, upon the defendants’ absolute refusal to correct the same or refusal to assume responsibility therefor, abandon the contract and recover his loss.
It is conceded by the defendants that a breach of contract by them entitles the claimant to a judgment, and that if the bursting of the sewer and their subsequent conduct in reference thereto is found by the court to constitute a breach, liability attaches.
In Anvil Mining Co. v. Humble, 158 U. S., 540, Mr. Justice Brewer, speaking for the court, said:
“ It is insisted, and authorities are cited in support thereof, that a party can not rescind a contract and at the same time *181 recover damages for his nonperformance. But no such proposition as that is contained in that instruction. It only lays down the rule, and it lays that down correctly, which obtains when there is a breach of a contract. Whenever one party thereto is guilty of such a breach as is here attributed to the defendant the other party is at liberty to treat the contract as broken and desist from any further effort on his part to perform; in other words, he may abandon it and recover as damages the profits which he would have received through full performance. Such an abandonment is not technically a rescission of the contract, but is merely an acceptance of the situation which the wrongdoing of the other party has brought about. Generally speaking, it is true that when a contract is not performed the party who is guilty of the first breach is the one upon whom rests all the liability for the nonperformance. A party who engages to do work has a right to proceed free from any let or hindrance of the other party, and if such other party interferes, hinders, and prevents the doing of the work to such an extent as to render its performance difficult and largely diminish the profits, the first may treat the contract as broken, and is not bound to proceed under the added burdens and increased expense. It may stop and sue for the damages which it has sustained by reason of the nonperformance which the other has caused.”
We have set forth the above quotation in extenso not alone because it is a most just and salutary exposition of the law, but because of the applicability of the language to the case at bar. The bursting of the 6-foot sewer occurred on August 7, 1906; the claimant immediately gave notice and preferred his claim under the contract; a board was convened, its report going alone to the cost of repairing the sewer, and it was not until November 14, 1907, more than a year after the break, that the defendants decided to annul the contract. The claimant advocated persistently for a decision as to responsibility for damages; a mere repair of the sewer brought no relief; the menace remained if a brick sewer was to remain in close proximity to his work upon which he had expended large sums of money and near which he had placed a costly plant. The defendants declined to submit plans and specifications structurally sufficient to care for the broken sewer; under the contract then the contractor could do no more than repair the old brick sewer, he was absolutely without authority to rebuild the bursted sewer in the manner the *182 defendants subsequently constructed it, to the advantage and benefit of his successors. It is no answer to this contention to say that sunshine and drought might have succeeded the rain and tides and no further trouble occurred and the contractor finished his work. In fact, the contrary presumption obtains; rains did fall and storms come. The damage had been done; a physical demonstration of the inefficiency of the defendants’ plans and specifications was before the contractor; the defendants knew it as well as he, and yet in the face of a situation so obviously perilous, a condition that made the execution of the contract impossible without the loss of all profits, no attempt was made by the defendants to correct this error and thereby enable the contractor to proceed in safety. To say that the contractor might have gone on and finished his contract work is the assertion of a conjecture which the defendants themselves by their subsequent conduct negative and deny, for just as expeditiously as they possibly could at their own expense they made impossible a recurrence of the disaster by changing the design in both material and workmanship for the construction of this sewer, thus again demonstrating that it was not impossible engineering to care for this condition in the first instance. The old brick sewer was torn out, its exposed ends made water-tight, and the contractor furnished a safe place to perform his contract work. Hoe v. Sanborn, 21 N. Y., 552.
Surely this contract is not unilateral, imposing upon the contractor not alone the physical duty of skillfully putting together the material in the way specified by the defendants, but the greater responsibility of warranting that this way will produce the contemplated result without loss, let, or hindrance. The defendants can not escape all responsibility for their part of the undertaking. No matter how precise the language of the scrivener, it has been universally held by the courts that the full measure of implied warranty attends the written undertaking and weighs with equality the reciprocal rights of the parties to the agreement, though it may not be found in the positive language of the written paper. A warranty does not hav.e to be in every instance expressed in the contract, and the fact that methods are provided for *183 changes in the contract, changes designed to produce with exactness the structural identity required by the plans and specifications, is a most potent argument in favor of the principle that the contractor is bound only to execute the plans of the defendants as he finds them, the defendants alone having the right to make the changes. The reason for the insertion of such a clause in the contract is a distinct recognition by the defendants that by their plans and specifications they impliedly warrant the structural sufficiency of the same and can not change, alter, or amend them unless the right to do so is reserved in the contract. The change, alteration, or amendment though made during the course of performance does not change the contractual rights of the parties except as to increased or decreased compensation. It does not affect the question of an implied warranty as to engineering sufficiency of the plans and specifications one way or the other. If liability attaches in the first instance it is equally potent under the changed condition.
We are unable to see any application of section 3744, Revised Statutes, to this case. The contract was in writing and met the requirement of the statute. The liability, if any exists, grows out of the written contract. It is just as much a part of the undertaking as any other feature of the work. It would be a rather novel proceeding to hold that the parties to this agreement, both claimant and defendant, could only be charged with such legal responsibility as the exact and limited language óf the contract expressly states. Contractual relations bring certain legal responsibilities—some ascertainable from the language used, others which the law implies from the relationship of the parties—and if the written instrument meets the requirements of a statute intended to prevent fraud, the contract is enforceable in law in all its legal aspects. We need not emphasize this assertion by a citation of authorities, for few, if any, contracts have ever been construed by the courts wherein the language used has been held to limit actions for their breach to a mere ascertainment of the meaning of the words. In this case there follows from the contract an implied obligation assumed by the contractor to do the contract work in a skillful and work *184 manlike manner; another that he assumes all risk for damages occasioned by any faulty construction due to his erroneous interpretation of the plans or unskillful workmanship. These obligations may or may not be expressed in the contract. The responsibility follows regardless of any express stipulation in the agreement, and the contractor could not escape it by a defense predicated upon section 3744, Revised Statutes.
The question of the sufficiency of the pleadings in this case was raised in this court by demurrer, and after mature deliberation the demurrer was overruled and the parties put upon their proof. This is not a case of attempted escape from difficulties attending the performance of a contract. These, of course, the contractor assumed and must abide his obligations. It is a case where the circumstances of the transaction disclose a condition ascribable to the defendants’ conduct, a condition brought about by the defendants which did not create difficulties but rendered the performance of the contract impossible unless the contractor would willingly assume immeasurable responsibilities for damages, a risk and responsibility not imposed upon him by the contract or fairly deducible from its express terms.
A suggestion of a defense was predicated upon section 21 of the specifications, entitled “ Contractor’s responsibility.” We do not believe it necessary to prolong the discussion of the case by adverting thereto. The clause has no application to a loss due entirely to the fault of the defendants. The wording of the stipulation limits its applicability to loss occasioned by some default of the contractor and is in no way involved in this case. The defendants do not emphasize the contention; in fact, concede, as before observed, liability in the event of a breach of the contract.
The damages recoverable follow the principles laid down in United States v. Behan, 110 U. S., 338. The record does not sustain a judgment for the entire sum of profits claimed in the petition. The court, sitting as a jury, from the whole record is convinced that the plaintiff under his contract could have completed the work and earned profits. Taking the testimony as a whole, we believe the contractor is entitled to $60,000 profits.
*185 The ascertainment of the figures appearing in Finding XU upon which we predicate the amount of judgment herein was made comparatively simple by the report of the naval board appointed by the defendants, and bearing date May 29,1907. This board, composed of competent engineers, made a detailed report covering the value of practically each and every item, including material on hand, in place, and all the tools and machinery necessarily employed upon the work. The court, in reconciling the adverse contentions respecting the amount involved, adopted this report as the best evidence of the facts stated therein; it eminates from an impartial tribunal composed of men in every way qualified to speak upon the subject; it preceded the annulment of the contract; claimant was represented, and the board confined its efforts alone to the ascertainment of values irrespective of the contentions of the parties respecting their rights under the contract. Taking the amounts found by the board and comparing them with the sums testified to by the claimant’s bookkeeper will forcibly demonstrate the accuracy of the results reached in Finding XII as to profits allowable. The claimant asserts that he actually expended in and about the performance of his contract up to date of annulment the sum of $274,597.88. In summing up this total many items of expense are included not properly chargeable to the defendants. Expenses incident to the attendance of witnesses and appearance of attorneys before the naval board are outside the ligitimate zone of recovery for the breach of the contract. The total cost of the plant necessary to perform the contract work is also included, and no account whatever is taken of its necessary depreciation or salvage value had the claimant been permitted to complete the contract. A plant which the board found to be reasonably worth the sum of $124,551.63 at the time of the claimed breach, and which amount is already included in the judgment of the court, would beyond question, as the record discloses, be worth at the completion of the contract at least 40 or 50 per cent of its value, thus saving to the claimant upon his total outlay the sum of $62.275.81, or about one-fourth of the amount heretofore alleged to have been expended, and when this sum is deducted from the alleged total *186 outlay it will confirm rather than dispute the accuracy of the court’s finding respecting profits and approximately harmonize the result as to the conflicting claims.
The rule as to damages taken from the Behan ease confines the judgment in that case to the reasonable expenditures made by claimant in the performance of the contract up to the time of the breach. In ascertaining this amount from a conflict in the testimony the court must look to the record as a whole, making its deductions in the form of a special verdict after deliberative consideration of all the testimony in the record. In the allowance of profits the court has followed the whole line of authorities cited with approval in the Behan ease. The claimant goes for profits lost as well as for sums expended. As we understand the rule, the profits recoverable are to be determined by the difference between the cost of performance and the contract price, and this must be shown with sufficient certainty to remove the contention from the domain of speculation or remoteness. The defendants challenge the possibility of anticipated gains by testimony in the main from the officers and employees of the succeeding contractors. In this respect they are at an apparent disadvantage by reason of their conduct subsequent to the annulment of the contract. The contract work which the contractor here involved obligated himself to perform was never performed by him or any other contractor. The testimony offered, necessarily hypothetical, is rested upon a false basis. The cost of a proceeding involving an undertaking enlarged at least to more than twice the work required of the claimant, and for which the defendants paid over two millions of dollars, is incomparable to the claimant’s work under his contract. It affords no just criterion by which to judge the possibilities of gain which the claimant, an experienced contractor, undoubtedly contemplated in entering into his contract, which indeed was materially less in extent and comparatively insignificant in price when compared with the final work and gross expenditure. It is sedulously advanced, however, that claimant’s own figures of expenditure, when viewed with reference to the amount of performance accomplished at the time of the breach, absolutely *187 preclude the possibility of gain. The record discloses, and the testimony concedes the fact, that the preliminary work preceding excavation and the work of excavating itself is the most expensive portion of the contractor’s performance. This particular feature of dry-dock construction involves the greatest hazard and expense. It would be manifestly unjust to find that the claimant with respect to this work was not in a favorable situation. On the contrary, except for the sudden and unexpected break in the 6-foot sewer, the work was progressing under circumstances comparatively free from unusual obstacles and in a manner indicating its expeditious completion without unusual expense. In fixing the total amount of profits allowable we have given full consideration to the “circumstances and subject matter of the contract.” Every item of expense viewed from every angle of competency has been deliberately charged to the contractor’s cost of performance, in addition to the sums set forth in Finding XII, his relief from the cares and risks incident to full performance have been considered, and from the whole record, taking into account the testimony of the witnesses, favorable and unfavorable, the allowance is proven to the satisfaction of the court. The claimant was entitled under the law to complete his contract; he has proven he could have completed it at a gain well within what the record indisputably discloses as a fair and reasonable profit under all the circumstances of the undertaking.
Judgment is awarded the plaintiff under Finding XII for $141,180.86. It is so ordered.
Barney, Judge, and Atkinson, Judge, concur.
Downey, Judge,
not having heard this case, took no part in the decision thereof.