## SQUARE CONST. CO. v. UNITED STATES.
### No. 46243.

Court of Claims.
March 3, 1947.

Nathan Patz, of Baltimore, Md., for plaintiff.

Horace G. Marshall, of Chicago, Ill., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and ...ADDEN, Judges.

JONES, Judge.

The plaintiff, a partnership, contracted with the defendant, acting through the Federal Works Agency, to construct approximately 10,550 feet of vitrified sewer, about 4,700 feet of which was to have a diameter of 33 inches and the remainder a diameter of 30 inches. This contract covered the part known as Section I of a gravity trunk sewer line which extended from Falls Church, Virginia, and vicinity to the Potomac River, having a total length of approximately 20 miles divided into six sections. The trunk sewer closely paralleled three streams known as Cameron, Tripps, and Holmes Runs, and at four points crossed under these or tributary streams.

Plaintiff's work was to begin at Station 60 and extend slightly beyond Station 165. The stations were approximately 100 feet each.

In addition to carrying sewage coming from other portions of the line, Section I was to carry the sewage from a quartermaster depot then in process of construction.

The work was to be done on a unit price basis in accordance with specifications, schedules, and drawings which were part of the contract. The estimated price was $116,677.25.

The work was to be completed within 90 calendar days after written notice to proceed, which was given May 8, 1942.

Plaintiff began work immediately.

The pipe was inspected and approved by defendant's inspector immediately before being laid in the trench. It was to be laid at depths varying from 5 to a little over 16 feet. Plaintiff presented to defendant monthly estimates of work performed and amounts due. Three of these estimates amounting to $97,841.38 were approved and paid. The remaining estimates are unpaid. Plaintiff sues for a balance of $40,979.47 which it claims to be due for work performed.

The defendant contends that plaintiff's work was defective and unsatisfactory, and that it was compelled to employ another contractor to replace some of plaintiff's work at a cost of $58,359.41, for which defendant sues by way of counterclaim.

The bottom of the trench in which the pipe was laid was composed of sand, clay and gravel which was generally soft and contained water. In order to keep the excavation free from water a narrow ditch was constructed in the floor of the trench in which was laid a 6-inch pipe. This drain pipe was covered with gravel to a depth of 6 to 18 inches, according to existing conditions.

The joints of the sewer pipes were to be caulked with jute and filled and sealed with a melted compound. Certain parts of the pipe, especially those under the streams, were to be encased in concrete. This was done. At other points the engineer was authorized to require a foundation of gravel or concrete should he determine that conditions required it.

A certain amount of leakage or infiltration was expected. The allowable infiltration was 10,000 gallons per mile for 24 hours. When tests were made the infiltration was disclosed to be 59,000 to 60,000 gallons per mile for 24 hours and at some points exceeded this amount.

At different times during the progress of the work the inspector required joints to be replaced or repaired and in some instances sections of pipe to be replaced. This was done when the inspector required that it be done. Plaintiff also remade some joints voluntarily.

On several occasions the plaintiff urgently insisted to a representative of the defendant that the depth at which a considerable portion of the pipe was to be placed would make the pressure too great for the pipe and joints to stand. It earnestly urged that the inspector authorize it to place a gravel or concrete cradle beneath and partly up the sides of the pipe. This was not done and plaintiff strongly insists that this failure to authorize it to so construct the sewer line was the cause of many of the difficulties and failure to meet the infiltration tests.

Colonel Longfellow, the commanding officer of the quartermaster depot, was very anxious to have the branch sewer line from the quartermaster depot connected with the main sewer line, and visited the project often, urging that the work be hastened.

He held a meeting in his office on July 25, 1942, and on July 27, 1942, the connection was made and the sewage from the quartermaster depot was turned into the main line.

Many of the joints leaked and a number of sections of pipe cracked. Plaintiff replaced with new pipe 11 cracked pipes and encased in concrete other sections of cracked pipe. Plaintiff also worked in the line to repair leaks. On October 3, 1942, plaintiff completed the remaining section from where the quartermaster depot line entered the main line to Station 165+42. Some repair work, however, was done after that date.

During the next few months considerable correspondence was carried on relating to the nature of the work, the meeting of tests, the replacing of pipes and the correction of alleged defects. On December 17, 1942, plaintiff presented its claim for payment in the sum of $9,518.85, covering work done between September 8 and October 5, 1942. It later submitted a fifth estimate covering additional work.

On August 21, 1943, defendant wrote plaintiff a letter in which it agreed to pay the sum of $9,518.85 covered by estimate No. 4 if plaintiff would sign an agreement that such amount constituted full and complete payment for all work performed and materials furnished over and above the 10% retained percentage in connection with the contract. The blank stipulation which plaintiff was asked to sign further stated that the Square Construction Company agreed that the defendant was not in default in any way whatsoever in connection with the contract. Plaintiff declined to agree to this proposal or to sign the stipulation. Thereupon the Government retained the $9,518.85, plus the 10% retained percentage. It claimed it was necessary to retain these sums to assure repairs and replacements essential to compliance with the specifications. After repeated discussions and exchange of letters the defendant on August 27, 1943, advised plaintiff that it was terminating plaintiff's right to proceed with the contract work.

Plaintiff claims that it is not only entitled to recover the $9,518.85, plus the 10% retained percentage, but also compensation for additional work it performed. It asserts that much of the difficulty was caused by unsuitable specifications which had been lifted from another contract that had to do with the construction of a much smaller sewer line and which were not drawn for pipe of the size used in this project. It also complains of the failure of defendant's engineer to authorize the construction of gravel or cement cradles which it claims were necessary to support the pressure at points where the pipe was placed at a depth of more than $11\frac{1}{2}$ feet, and that much of this pipe was so placed.

Defendant, on the other hand, complains that plaintiff's work did not meet the tests which the specifications set out; that the plaintiff failed to tamp the fill as the specifications required; that the infiltration was far in excess of the allowable; that the joints leaked and were not properly caulked and filled; that the pipe was improperly laid; that the work was successfully completed by another contractor who had by that time finished another part of the line, and that he operated under the same specifications. Their positions are far apart.

This is a factual case. There are 1,600 pages of testimony. Much of it is conflicting, and we find difficulty in arriving at a satisfactory conclusion of the whole matter. Not only is the testimony conflicting as to the nature of the work that was done, but the experts differed widely with each other and in some instances contradicted themselves.

To complicate matters, the work was done in wartime when there was a shortage of labor and materials and when there were many other difficulties incident to that period. The colonel at the quartermaster depot was insisting upon expediting the work. He had nothing to do with the contract directly, but he was in uniform and visited the work almost daily. The testimony reveals that he was a master of the colorful art of swearing—at least his language was picturesque. No doubt his attitude and the conditions generally caused both the contractor and the Government inspector to hasten the sewer connection in order to satisfy him.

Out of the testimony certain facts appear rather clearly. The Government engineer who prepared the specifications admitted that he lifted many of the paragraphs bodily out of another contract which had to do with much smaller pipe. These evidently did not altogether fit the new type of work. Spearin v. United States, 51 Ct. Cl. 155. One of the requirements was that a man put his arms around the pipe and adjust some of the sealing around the joints. It is difficult to visualize an ordinary man reaching around pipes that are nine feet in circumference.

On the other hand, it is rather clear that many of the annular joints were not properly caulked, that many of the annular spaces were not properly filled, that some of the pipes were not properly laid, and that especially at first plaintiff lacked adequate tamping tools.

The plaintiff also claims that it is entitled to payment for extra work, replacements and changes.

A large sum was paid to the new contractor. His work was on a cost-plus basis. The new contractor was given wider freedom in his operations and was permitted to use some methods which plaintiff had sought to use, but which the engineer in charge would not authorize. However, it was necessary to make repairs and to excavate and install substantial replacements in order to offset the defective work that was done by the plaintiff, and which became apparent during the first few months following the completion of the contract.

The contract contained the following provision:

"Neither the final certificate of payment nor any provision in the Contract Documents * * * shall constitute an acceptance of work not done in accordance with the Contract documents or relieve the Contractor of liability in respect to any express warranties or responsibility for faulty materials or workmanship. The Contractor shall remedy any defects in the work and pay for any damage to other work resulting therefrom which shall appear within a period of one year from the date of final acceptance of the work unless a longer period is specified."

We feel, therefore, that any additional amounts which would otherwise be due the plaintiff should be offset against the necessary additional repair and replacement work which defendant had the new contractor perform. We find that plaintiff is entitled to recover the sum of $12,622.69, and that defendant is entitled to take nothing on its cross action against plaintiff.

It is so ordered.

MADDEN, WHITAKER, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.