**J. L. SIMMONS COMPANY, Inc.**

v.

**The UNITED STATES.**

No. 186–59.

United States Court of Claims.

July 16, 1969.

Paul E. McNulty, Washington, D. C., for plaintiff; John W. Gaskins, Washington, D. C., attorney of record. King & King, Washington, D. C., of counsel.

Irving Jaffe, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant; Robert R. Donlan, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

### PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to make recommendations for conclusions of law on plaintiff's motion for partial summary judment and defendant's cross motion for partial summary judgment under the order of reference and Rule 99(c). The commissioner has done so in an opinion and report filed on January 21, 1969, wherein such facts as are necessary to the opinion are set forth. Plaintiff requested the court to adopt the commissioner's report with one exception and defendant requested the court to review the report in its entirety. Briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court agrees with the commissioner's opinion and recommended conclusion of law with certain changes and modifications, it hereby adopts the same, as hereinafter set forth, as the basis for its judgment in this case.

Therefore, it is concluded that with respect to claims covered by the Veterans' Administration Contract Appeal Board's decision of May 31, 1967, plaintiff's motion for partial summary judgment is granted, defendant's cross motion is denied, and plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $480,956.43. Plaintiff is also entitled to recover on Claim No. 3, Part A., the amount of recovery to be determined pursuant to Rules 47(c) and 64(e). Plaintiff is not entitled to recover on its claim for interest and as to that claim, the petition is dismissed. Plaintiff's petition is also dismissed with respect to the claim for bond premiums, except to the extent that this claim may be relevant in further proceedings under Rules 47(c) and 64(e).

Commissioner Spector's opinion, as modified by the court, is as follows:

To establish the present posture of this venerable case, and to know how best to proceed with it from here, one must perforce describe where it has been. Its travels rival those of Odysseus, and the Wunderlich Act[1] has represented to it obstacles as formidable as Scylla and Charybdis.

In United States v. Carlo Bianchi & Co.,[2] the Supreme Court described the chronology of that case as constituting "delay at its worst," and it sought by its ruling therein to ameliorate such delays in the future. Regretfully, *Bianchi* will have to step aside for a new champion.

On October 5, 1949, the plaintiff undertook to construct a hospital and related buildings and facilities for the Veterans' Administration at Chicago, Illinois. The contract price was $6,985,905, and the completion date September 18, 1951. Work was actually completed April 30, 1953. The events from which this litigation arose relate primarily to the

---

[1]. 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964 ed.).

[2]. 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). *See also* United States v. Utah Const. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), and United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

pile foundation for the main hospital building.

The specifications, which were prepared by the defendant, are a classic example of "design" specifications, and not "performance" specifications.[3] In other words, in these specifications, the defendant set forth in precise detail the materials to be employed and the manner in which the work was to be performed, and plaintiff was not privileged to deviate therefrom, but was required to follow them as one would a road map. In contrast, typical "performance" type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.

This opinion need not be burdened with the more than ample detail spread over an unusually extensive administrative and judicial record underlying the case. Suffice it to say that Section 2 of the contract specifications dealing with the pile foundation contained the most definite and precise requirements with respect to the piles to be installed. They were to be cast-in-place concrete type piles cased with a steel shell, and were to be one of three types. Plaintiff selected a pedestal-type pile, described in the specifications as follows:

> 2–6(b) By driving a casing and removable core to the required penetration and bearing, removing core, placing at least 4½ cubic feet of concrete in the casing, replacing the core, and driving the apparatus into the concrete to form a base, removing the core and inserting a shell which shall rest upon and be sealed by the concrete at the lower end, removing casing and filling shell with concrete.

Furthermore, bidders were advised that defendant's design for this site was based on a working load of 40 tons per pile for the main hospital building, and 30 tons per pile for other buildings and structures. The specifications further provided that one pile of each type was to be tested prior to the commencement of pile driving operations. A 40-ton pile was to be loaded with 80 tons, and a 30-ton pile with 60 tons, following which certain limitations upon settlement were imposed before the tests could be considered satisfactory.

As originally prepared by the defendant, the specifications required preexcavation, or coring, to penetrate materials overlying a sand and gravel stratum at which level the piles were designed to encounter the necessary resistance to produce bearing capacity. Precoring is required by a designer to avoid excessive movement of piles during installation resulting from displacement of earth, it being a well-established truth that two objects cannot occupy the same space at the same time. Excessive displacement occurs when there is too high a concentration of piles in too small an area. However, by an amendment to the invitation for bids prior to bid opening, the defendant specifically eliminated this specification provision for preexcavation or coring, thereby indicating that the designer did not contemplate displacement problems at this particular site. This was further indicated by the fact that the pedestal-type concrete pile employed is not one that can be reseated and redriven, should movement later occur.

The contract further set forth with complete specificity the pile driving equipment to be employed, and the procedures for their use, and these were approved in advance. Required bearing for 40-ton piles would be indicated when the penetration under the last 32 blows of a hammer, delivering 15,000 foot pounds of energy, did not exceed 6 inches, and the penetration under the last seven blows did not exceed 1 inch.

The specifications required that a completed pile was not to be out of plumb more than ⅛ inch per foot, and the

---

3. *See*, for example, Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966). For a discussion, *see* Aerodex, ASBCA No. 7121, 1962 BCA ¶ 3492.

movement of pile groups, or clusters, was not to exceed 1 inch for groups of six or less, 1½ inches for groups of seven to 10, and 2 inches for groups of 11 or more piles. After all pile shells in a particular group were in place, and had been inspected and approved by defendant, plaintiff was to fill them with concrete, as above described.

■ In summary, these were specifications of the type which have traditionally been held to carry with them the implied warranty by the party preparing them that if followed, a satisfactory result will pertain.[4]

Plaintiff's subcontractor for the pile foundation was MacArthur Concrete Pile Corporation of New York City, a long-established specialist in this type of work. MacArthur moved onto the site on December 2, 1949. On December 12 and 13, 1949, MacArthur drove a 6-pile cluster of 40-ton piles to provide a pile for the test above described. Five of the piles in the cluster were pedestal piles and the sixth was a straight-cased pile driven with the approval of the defendant, and selected by it for testing. On December 28 and 29, 1949, it failed the test to which it was subjected. Defendant next selected a pedestal pile for testing on January 4 and 5, 1950, and it, too, failed to satisfy the settlement limitations prescribed by the specifications.

Defendant, seeking a satisfactory substitute for the type of pile originally specified, then ordered the installation of six additional test piles of varying types, and required five of these to be load-tested. With the exception of an all-pipe pile, none of the test piles met the

settlement restrictions. The second-best pile tested was a so-called composite type. Because the six additional test piles ordered were in excess of the two required by the contract, plaintiff gave notice during the course of this work that it expected to be paid therefor. On February 23, 1951, the contracting officer denied plaintiff's claim, and plaintiff noted a timely appeal to the Veterans' Administration Construction Contract Appeals Board. This will hereinafter be referred to as Claim No. 1

On February 27, 1950, the parties met in Washington, D.C. to discuss the test pile program. The tests had indicated that the Government-designed 40-ton pedestal piles, even when driven far beyond the order of magnitude contemplated by the original specifications, would not support the design loads. Thereafter, defendant concluded that it would substitute composite-type piles for the pedestal piles.

A composite pile is a cast-in-place concrete and pipe pile consisting of two separate sections. The upper section is cased with a light gauge steel shell form, as was the originally specified pedestal-type. However, the lower section consists of a heavy steel pipe of smaller diameter, pointed at the end. After it is driven, both shell and pipe sections of the composite pile are filled with concrete. Defendant had concluded that the pedestal pile was undependable at the designed load because reasonable driving would not provide sufficient penetration, because there was an absence of beneficial side friction, and because soil conditions would not permit proper

4. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Centre Mfg. Co. v. United States, 392 F.2d 229, 183 Ct.Cl. 115 (1968); Luria Bros. & Co. v. United States, 369 F.2d 701, 177 Ct.Cl. 676 (1966); North Am. Philips Co. v. United States, 358 F.2d 980, 175 Ct.Cl. 71 (1966); J. D. Hedin Const. Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70 (1965); Laburnum Const. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963); Helene Curtis Indus., Inc. v. United States, 312 F.2d 774, 160 Ct.Cl.

437 (1963); R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953); Stapleton Const. Co., etc. v. United States, 92 Ct.Cl. 551 (1940); Steel Products Engineering Co. v. United States, 71 Ct.Cl. 457 (1931); Penn Bridge Co. v. City of New Orleans, 5 Cir., 222 F. 737, cert. denied, 239 U.S. 639, 36 S.Ct. 160, 60 L.Ed. 481 (1915); Bush v. Jones, 3 Cir., 144 F. 942, 6 L.R.A.,N.S., 774 (1906); and Sickels v. United States, 1 Ct.Cl. 214 (1865).

forming of pedestals. In contrast, the heavy, pointed, lower section of a composite pile would penetrate considerably further into the bearing stratum and retain the benefit of the side friction thereby developed.

Defendant drafted specifications for the 40-ton composite pile, prescribing them in complete detail and, as in the case of the original specifications, the precise methods and procedures for driving and forming. The casing and a close fitting interior core were to be driven to a depth approximately equivalent to the length of the upper section of the pile. The core was then to be removed and a pipe section inserted. The core was then to be replaced and the pipe section driven to the required penetration and bearing. Thereafter, the core was again to be removed and the upper steel shell set, anchored and sealed. The casing was then directed to be removed and the pipe and shell filled with concrete.

The specifications further directed that in forming the splice between the upper and lower sections, not less than 2 feet of pipe were to remain within the casing of the pile, and the shell for the upper section was to extend not less than 18 inches below the upper end of the pipe section. The pipe section was to be driven until the penetration under the last 25 blows of a hammer delivering 15,000 foot pounds of energy was not more than 1 inch. The driving requirements for the 30-ton piles forming the foundation under buildings other than the hospital building, were increased to match one of the 40-ton test piles previously mentioned.

The foregoing substituted specifications have once again been set forth in some detail primarily to demonstrate that they too were design (and not performance) specifications, and that they also carried with them the traditionally implied warranty as to their sufficiency, by the party preparing them.[5] On March 1, 1950, defendant requested plaintiff's proposal for these changes and it was submitted March 3rd. It was unacceptable to defendant and, on March 7, 1950, defendant unilaterally directed plaintiff by Change Authorization No. 1 to proceed with the revised foundation work, the adjustment of price and time to be determined later.

Thereafter, by letter of April 3, 1950, defendant further refined its instructions with respect to the composite piles, to require that the casing and core, or driving apparatus, be driven to a definite penetration of from 6 to 12 blows to the final inch. If driving warranted, the length of the pipe section was to be less than 15 feet, and the piles were to be filled with concrete by clusters, and not individually. Plaintiff objected to these new instructions in a letter dated April 25, 1950, as being in excess of the requirements of the aforementioned Change Authorization No. 1. It advised defendant that this would involve an additional adjustment of price and time.

Long after completion of the pile foundations, and specifically on March 13, 1953, defendant unilaterally issued Change Order 4–G, allowing $151,633, and a 56-day time extension directed solely to the change of the 40-ton piles from pedestal to composite-type. This allowance was deemed inadequate in all respects by plaintiff, and a timely appeal was taken to the Veterans' Administration Construction Contract Appeals Board. It will hereinafter be referred to as Claim No. 2.

A total of 1,899 piles were required for completion of the work, of which 1,678 related to the main hospital building. Plaintiff commenced driving on April 3, 1950, and by June 28, 1950, it had driven 1,312 composite-type piles, which was 78.2 percent of the composite piles for the main hospital building. By that date plaintiff had also advanced beyond the concreting of piles and had placed specified concrete pile caps and anchor bolts on some of the completed pile clusters so that they were ready for the steel columns. There had been placed 104 of

5. *See* note 4 *supra.*

such caps, and 141 pile clusters remained to be driven and/or capped.

Late in June 1950, plaintiff believed that it detected movement in some of the pile clusters previously driven (and in some instances capped), and plaintiff brought this to the attention of defendant.

On June 29, 1950, plaintiff wrote to defendant to confirm that upward and horizontal movements had occurred in certain areas of the project, and it requested instructions on future procedures, without delay. Therafter, plaintiff repeatedly requested instructions on what was to be done about this serious development, but defendant instructed plaintiff to continue driving the remaining 366 composite piles for the hospital building without change in the required driving methods and procedures. Coincidentally, defendant began to reject previously installed piles and caps, and suggested that plaintiff perform certain preliminary exploratory work to determine the extent of the damage to the foundation, and that plaintiff prepare a survey showing the extent of the pile movements that had occurred. Plaintiff disclaimed responsibility for the movement of the piles and the foundation damage. It drove the remaining piles as instructed, completing the work on August 3, 1950.

The work was slowed down or delayed during the period June 28 to August 3, 1950, by the above described circumstances. Moreover, when the pile driving had been completed on August 3, 1950, defendant still had no substitute plan, nor had it issued any instructions for correction of the movement or damage which had occurred. The project was at a standstill until September 26, 1950, at which time defendant issued restoration instructions, and a schedule of 42 piles to be corrected by the installation of H-piles of stated dimensions. It directed plaintiff to proceed with the corrective work, at the same time disclaiming responsibility therefor, and threatening termination for default unless progress was shown by October 3, 1950. Plaintiff proceeded on September 28, 1950, under protest.

This restoration work was extensive, consisting of the testing of 33 piles under loads of 80 to 100 tons; the reseating of 664 uncapped piles by 40-ton pull-down and 50-ton jack-down methods; the reseating and testing of 23 capped clusters by gross loads applied under a formula of 50 tons plus one additional ton for each square foot of pile cap; the driving of 163 H-piles to correct for lateral movements; the removal of caps from eight clusters that had moved laterally, in order to permit driving of 11 of the corrective H-piles; the construction of reinforced concrete struts to interconnect and brace 14 pile caps; the construction of pile caps to conform to the redesigns; revisions and additions to existing caps; the reseating of anchor bolts on 12 caps; and the strengthening of the walls of the elevator pit.

By April 30, 1951, the restoration work had progressed to the point where it was no longer delaying advancement of the project, and by May 16, 1951, 233 days after the issuance of instructions on September 26, 1950, this restoration work was completed. Change Order 4–G of March 13, 1953, mentioned earlier in connection with the changeover from pedestal to composite-type piles, included nothing for this restoration work and plaintiff was not paid therefor. On the contrary, defendant withheld payments admittedly due plaintiff for other work not in dispute, to recoup earlier payments made by defendant following its prior inspection and acceptance of the composite piles. Plaintiff points out that this withholding, coupled with the fact that the restoration work had to be accomplished at great expense during the severe winter of 1950–51, caused the financial ruin and bankruptcy of its foundation subcontractor, MacArthur Concrete Pile Corporation.

In addition to the added cost of the restoration work, plaintiff and its subcontractors were subjected to increased costs by reason of the delay to the whole project which resulted while the restora-

tion work was being performed. Plaintiff and its subcontractors claimed the additional cost of restoring the damaged foundation, and also for the delays to the whole project which resulted from the foundation failure. On February 23, 1951, the contracting officer rendered a decision denying all responsibility for the foundation work, for the cost of restoring it, and for the delays relating to and resulting therefrom. This decision was timely appealed March 20, 1951. It is hereinafter referred to as Claim No. 3, Part A. (delay-damages), and Part B. (restoration cost).

On December 17, 1953, plaintiff requested time extensions totaling 535 calendar days, consisting of 366 days for the foundation difficulties above described and 169 days for unrelated changes. The contracting officer, not responding directly to the request, issued a series of change orders allowing plaintiff 534 calendar days, but ascribed them to causes unrelated to the foundation. Plaintiff appealed these change orders, contending that only 169 of the 534 days should have been granted for changes unrelated to the foundation, and the remainder assigned to the foundation difficulties and restoration work. This seemingly academic dispute has a bearing, in fact, on the aforementioned monetary claim (No. 3, Part A.), growing out of delays attributable to the foundation difficulties. It is hereinafter referred to as Claim No. 4.

On May 5, 1954, the contracting officer deducted from monies otherwise due plaintiff the sum of $6,500, on the grounds that this represented the cost of engineering services rendered to defendant by a private consultant as to means of overcoming the pile movement problem previously described. This dispute is hereinafter referred to as Claim No. 5.

In 1955 and 1956, plaintiff was permitted to appear and present witnesses before the Construction Contract Appeals Board of the Veterans' Administration with respect to all of its appeals, as above described. Under the procedures then in effect, that Board acted in an advisory capacity to the Assistant Administrator for Construction, who, in turn, was authorized to consider and decide contract appeals by the Administrator of Veterans' Affairs, the head of the department as set forth in the "Disputes" article contained in the contract. The record of those hearings consisted of 1,414 pages of transcript and 286 exhibits, to which the Board on its own initiative added 82 documents characterized as "Board" exhibits.

Although plaintiff's witnesses were orally examined before the Board and cross-examined by the Board, no witnesses appeared for the Government. Instead, following the conclusion of appellant's presentation, the Board received and considered reports from a Veterans' Administration structural engineer, a New York consulting engineer, and a faculty member and consulting engineer at the University of Michigan. This was over plaintiff's objection, since plaintiff was not permitted to confront or cross-examine these persons. In connection with a claim for interest later described in greater detail, and predicated on the theory of a taking in violation of the fifth amendment, plaintiff characterizes these proceedings before the Board as a travesty on administrative justice and fair play. Moreover, in a current request for a de novo trial of the facts relating to this claim for interest,[6] plaintiff charges that not only were there the admitted ex parte communications above described, but the same person represented the Government as advisor to the contracting officer, and then prepared the Board's decision hereinafter described, thereby combining the roles of prosecutor and judge simultaneously throughout the proceedings before both the contracting officer and the Board.

The decision of the Board is dated February 12, 1959. It is 230 pages in length and is supplemented by a further

6. *See Bianchi* and *Utah*, note 2 *supra.*

decision dated March 27, 1959, relating to the above-mentioned withholding by the defendant of $6,500 on May 5, 1954, for "engineering services." (Claim No. 5.) These advisory decisions were adopted and approved by the Assistant Administrator for Construction on February 20, and March 31, 1959.

In the interest of simplification of these lengthy decisions, the claims are grouped and numbered to show their disposition by the Board:

*Claim No. 1—Additional Test Piles and Testing*

Claimed: $19,285.31, plus overhead and profit, and a time extension of 54 days.

Action by Contracting Officer: Denied.

Action by Board: Allowed $6,274.34, and no time extension.

*Claim No. 2—Additional Work Required Under Change Authorization No. 1 and Change Order 4–G (Substitution of Composite Piles for Pedestal Piles)*

Claimed: $320,568.17 (est.), and a time extension of 65 days.

Action by Contracting Officer: Allowed $151,633, and 56 days.

Action by Board: Allowed only $108,275 (a reduction of $43,358). As to this the petition states that the Board "without advising plaintiff that the amount of $151,633.00 allowed by the contracting officer was in jeopardy, and without calling witnesses, undertook to seek counsel and advice from persons who were not brought before the Board in plaintiff's presence, and without affording plaintiff an opportunity to confront said persons or to interrogate them, erroneously concluded on the basis of their advice that the amount that had been allowed by the contracting officer was excessive, and ordered the withholding of $43,358 from monies otherwise due plaintiff * * *."

The claim for additional time was declared moot by the Board because of the time extensions which had been given for unrelated changes.

*Claim No. 3—A. Damages for Delay Resulting From Failure of the Defendant's Pile Foundation Design, From Failure To Provide Remedial Procedures When Required, and From Interruption of the Overall Project To Permit Restoration of the Foundation; and B. The Additional Work and Actual Cost of Restoring the Foundation*

Claimed: $2,300,000 (as approximated in the Board's decision), and a request for a finding that time extensions granted for changes unrelated to the foundation, should in fact be ascribed to the foundation failure.

Action by Contracting Officer: Denied.

Action by Board: Denied. Moreover, the Board deducted the sum of $43,096.98 from amounts otherwise earned by plaintiffs and not in dispute, to cover alleged expense incurred by defendant in providing the corrective foundation designs.

*Claim No. 4—That Contracting Officer erred in Holding That the 534 Days of Time Extensions Granted Were Properly Assignable to Unrelated Change Orders, and Not to Foundation Failure*

Claimed: That 366 days of this allowance should be ascribed to foundation failure.

Action by Board: Time extension granted by Contracting Officer was held to have been properly assigned to the unrelated change orders. However, the sum of $164,250, which the Contracting Officer had been withholding as liquidated damages since February 12, 1954 should, it was held, be remitted to plaintiff.

*Claim No. 5—Deduction by Contracting Officer of $6,500 for Engineering Services Allegedly Paid Private Consultant in Overcoming Pile Movement Problem*

Claimed: $6,500.

Action by Board: Allowed $1,395.39. The Board held, in effect, that the deduction by the Contracting Officer was proper; but only to the extent of $5,104.61.

There followed immediately plaintiff's first petition herein on April 23, 1959. Plaintiff averred therein that the decision of the Board was without finality because the foundation problems and related and consequent delay-damages were attributable to breach of defendant's implied warranty regarding the sufficiency of its design, and were therefore not within the province of the Board to determine. Alternatively, plaintiff attacked the finality of the Board decision by charging that "it was a travesty upon administrative justice and fair play, or was arbitrary, or capricious, or so grossly erroneous as to imply bad faith, or not supported by substantial evidence." [7]

For the claims summarized above, plaintiff sought judgment in the sum of $1,498,299.36. All matters were put in issue by defendant's answer of September 15, 1959.

These events all occurred prior to the interpretations of the Wunderlich Act by the Supreme Court in *Bianchi, Utah,* and *Grace,*[8] and the parties thereafter engaged in a series of procedures looking forward to a trial of the case in this court. Some of those procedures are briefly mentioned hereinafter solely to complete the chronology of events, and to account for the period of time involved. A more detailed summary would serve no useful purpose, since all of those proceedings leading to trial were aborted by subsequent events. Suffice it to say that the record features an unusually large mass of material in the form of motions, lengthy briefs, pretrial procedures, orders, and decisions generally relating to three areas.

In the area of pretrial and discovery, plaintiff undertook to prepare comprehensive accounting schedules pursuant to then Rule 28(a) (2), and also moved for discovery of information regarding the administrative procedures of the aforementioned Board in the Veterans' Administration with which it had taken issue. This was stoutly resisted by defendant's counsel on the grounds of "executive privilege." Moreover, defendant countered with a comprehensive discovery motion of its own, seeking all manner of information dealing with the relationship between plaintiff and its subcontractors.

Defendant concluded therefrom that it had a partial defense to plaintiff's claims based on the so-called "Severin" cases[9] which involved suits for damages for breach of contract based on Government delays. Briefly stated, the rule in those cases is that damages must be sustained to be recoverable, and when they have been sustained by subcontractors who have in their respective subcontracts absolved plaintiff-contractor from any liability for damages of the type sought by plaintiff, the latter has not sustained any damages, and therefore cannot recover. Defendant filed a motion for partial summary judgment on January 29, 1962, based on this theory, and it was rejected in an opinion of the court dated July 18, 1962, holding the so-called "Severin" doctrine inapplicable to the facts of this case.

But fundamentally, the major difficulties in which the case became enmeshed stemmed from the fact that it straddled in point of time the *Wunderlich* case,[10] the Congressional reaction thereto culminating in the Wunderlich Act,[11] and the three occasions in *Bianchi, Utah,* and *Grace,*[12] on which the Su-

---

7. The latter terms are the tests prescribed by the Wunderlich Act, note 1 *supra.*

8. *See* note 2 *supra.*

9. Severin v. United States, 99 Ct.Cl. 435 (1943), cert. denied, 322 U.S. 733, 64 S. Ct. 1045, 88 L.Ed. 1567 (1944) ; Continental Ill. Nat. Bank & Trust Co. v. United States, 115 F.Supp. 892, 126 Ct.Cl. 631 (1953) ; Continental Ill. Nat. Bank & Trust Co. v. United States, 101 F.Supp.

755, 121 Ct.Cl. 203, cert. denied, 343 U.S. 963, 72 S.Ct. 1057, 96 L.Ed. 1361 (1952) ; Continental Ill. Nat. Bank & Trust Co. v. United States, 81 F.Supp. 596, 112 Ct.Cl. 563 (1949).

10. United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951).

11. Note 1, *supra.*

12. Note 2 *supra.*

preme Court undertook to review that Act, and its relationship to the Tucker Act [13] jurisdiction of this court. Moreover, this particular case uniquely presented all of the problems with which the Supreme Court was confronted in those cases.

It will be recalled that the petition sought damages for breach of contract, a remedy not available administratively, and that the parties proceeded initially to a trial. The case was at one time actually set for trial. The discovery proceedings previously mentioned, and defendant's initial reliance on the "Severin" doctrine are consistent only with a trial, and with a plea for damages based on breach. After *Bianchi*, however, issue was joined on whether the court was limited to a review of the administrative decision, measured solely against the agency record. The grave infirmities in those administrative proceedings, later confirmed, militated against a review limited solely to that record. *Utah*, when it was published, highlighted the distinction required to be drawn between claims "redressable under the contract," and those for breach of contract and therefore not subject to the *Bianchi* rule. This case featured claims of both types and, in addition, findings of fact common to both types. This was an additional consideration covered in *Utah*.

*Bianchi* had observed that "if the administrative record is defective or inadequate, or reveals the commission of some prejudicial error * * * there would undoubtedly be situations in which the court would be warranted, on the basis of the administrative record, in granting judgment for the contractor without the need for further administrative action * * * [and] in situations where the court believed that the existing record did not warrant such a course * * * we see no reason why the court could not stay its own proceedings pending some further action before the agency involved." *Grace* had confirmed this dicta in an actual case. Whereas defendant

had originally insisted on a review of the agency decision limited strictly to the administrative record, when the latter was properly stripped of the tainted evidence which plaintiff had never had an opportunity to confront or cross-examine, defendant then urged that the record was "defective and inadequate," and required a stay of proceedings in this court and a retrial before the agency board, under the *Grace* ruling.

The culmination of all of the foregoing, was an order filed June 30, 1966, the effect of which was to suspend proceedings in this court in order that the Contract Appeals Board in the Veterans' Administration might remedy the defects and inadequacies in its record, reconsider plaintiff's appeals, and render a decision thereon. This the Board proceeded to do after conducting very extensive hearings between July 11, 1966, and October 26, 1966. To demonstrate the scope of these supplemental hearings, they produced 5,335 pages of transcript and 211 exhibits, in contrast with the 1,414 pages of transcript and 286 exhibits produced during the 1955–56 hearings.

The second decision of the Board, published May 31, 1967, is a vast improvement over the first and it reflects all of the attributes of the due process hearings on which it was based. In fact, it acknowledges at the very outset the infirmities which characterized the first hearings, their ex parte nature, the "Board exhibits" added by that earlier Board on its own initiative, and the fact that the first decision was based on engineering reports received after the conclusion of the appellant's presentation so that appellant had no opportunity to confront or cross-examine them. "These reports," the Board states, "in general supported the Government's position with respect to Appellant's claims."

The 1967 decision of the Veterans' Administration Contract Appeals Board on behalf of the Administrator is hereinafter set forth in some detail. The

13. 28 U.S.C. § 1491.

decision is 115 pages in length, very comprehensive, and carefully delineates its narrative or historical findings of facts and its ultimate findings, findings which it states "have in our judgment been established by a preponderance of all of the credible evidence in the supplemented record." The following analysis conforms to the simplified numbering and analysis of plaintiff's claims set forth earlier in this opinion, rather than to the order in which the claims are discussed in the Board's 1967 decision.

## THE BOARD'S DECISION

*Claim No. 1—Additional Test Piles and Testing*

In its 1967 decision, the Board found that "the test program contemplated by the original contract was never carried out. * * * After failure of Test Pile No. 2 the Government issued instructions for special methods of forming, driving, and testing as a basis for selecting a suitable pile for the foundation. MacArthur [the foundation subcontractor] performed this work as directed."

The decision continues to the effect that the "specifications adopted by Change Authorization No. 1 and as amended on April 3, 1950, as to both types of piles were definite and precise and left nothing to the discretion of the contractor beyond the ordinary incidents of good workmanship. * * * The contention that Appellant failed to furnish proper test reports and failed to keep the Government informed of developments in the field is not supported by the record. * * * Technically the test pile claim does not fall within the scope of the appeal from Change Order 4–G [designated herein as Claim No. 2] because the tests preceded and furnished the basis for the change. * * * We therefore regard the Contracting Officer's orders for special test piles as a constructive change to the contract for which payment has been denied. * * * The originally contemplated testing program did not, to the limited extent it was carried out, produce the results that had

been anticipated and the price adjustment due is the difference between the reasonable cost of the original program and the cost of the preliminary test program as actually executed."

Thereafter, utilizing approved methods for determining an equitable adjustment in contract price, and the computations of a Dr. Feld, the Government's cost consultant, the Board concluded that "the difference between original contract testing work and the testing work as changed would be $19,089.53, an amount not substantially different from the sum of $19,285.31 which is claimed by Appellant to have been the difference in the cost of the work."

"We accept Appellant's direct cost claim of $19,285.31 as the difference between the reasonable costs of work performed and the original contract work. To this sum MacArthur is entitled to 10% overhead and 10% profit and Appellant a prime contractor's fee of 7½%. From the resulting total of $25,085.36 is deducted the previous allowance of $6,274.34, for a net additional entitlement of $18,811.02."

*Claim No. 2—Additional Work Required Under Change Authorization No. 1 and Change Order 4–G (Substitution of Composite Piles for Pedestal Piles)*

The Board's decision states, correctly, that "the measure of the equitable adjustment due Appellant should be the difference between the reasonable cost of performing the work as changed and the amount it would reasonably have cost to perform the work originally specified." And the Board then quotes from this court's decision in Bruce Const. Corp. v. United States, 324 F.2d 516, 163 Ct.Cl. 97 (1963), as follows:

To say that "reasonable cost" rather than "historical cost" should be the measure does not depart from the test applied in the past, for the two terms are often synonymous. And where there is an alleged disparity between "historical" and "reasonable" costs, the historical costs are presumed rea-

sonable. 324 F.2d at 519, 163 Ct.Cl. at 101–102.

After an exhaustive analysis of the evidence addressed to this issue of equitable adjustment, the Board concluded that "$210,935 represents the reasonable cost of the originally specified work." It also concluded, contrary to the finding of the contracting officer, "that there was a contract change with respect to the 30-ton pedestal piles for which Appellant should be compensated." The opinion continues:

Appellant has established that MacArthur's direct costs of installing all 40-ton and 30-ton piles in accordance with the Change Authorization were $362,733.99. The Government has not shown that these costs were unreasonable. MacArthur is therefore entitled to those direct costs plus 10% overhead and 10% profit, less $210,935 as the reasonable cost of original work omitted. The net allowance to MacArthur is $228,009.43.

Adding to this an allowance of 7½ percent for both overhead and profit for plaintiff-prime contractor, brings the total allowance to $245,110.14.

It will be recalled that the 1959 decision of the Board had allowed and paid $108,275 on this claim (i. e., $151,633 allowed by the contracting officer, less $43,358 deducted, without prior notice, by that 1959 Board decision). The 1967 Board decision concludes that plaintiff is entitled to $245,110.14, less the $108,275 previously paid, or $136,835.14, as an additional allowance under Change Order 4–G.

*Claim No. 3, Part A. Damages for Delay Resulting From Failure of the Defendant's Pile Foundation Design, From Failure To Provide Remedial Procedures When Required, and From Interruption of the Overall Project To Permit Restoration of the Foundation; and Part B. The Additional Work and Actual Cost of Restoring the Foundation*

As might be expected, the bulk of the 1967 decision of the Board is devoted to this claim, involving as it does the basic determination of responsibility for failure of the foundation. Moreover, the Board devoted itself principally to the portion of Claim No. 3 designated as Part B. above, the additional work and actual cost of restoring the foundation. It treated only briefly with Part A., damages for delay, as follows:

Appellant has also presented numerous claims for increased costs alleged to have resulted from the Government's failure to provide a workable design, as distinguished from its claims for the direct cost of performing changed or extra work ordered by the Contracting Officer:

[Listing these individual claims]

Since the contract did not contain a suspension of work clause and the foregoing appear to be in the nature of claims for unliquidated damages for breach of contract rather than for relief under its terms, we make no findings and dismiss the claims for lack of jurisdiction in accordance with the decision of the Supreme Court in Utah Construction and Mining Company, 384 U.S. 394 [86 S.Ct. 1545, 16 L.Ed. 2d 642], decided June 6, 1966. In that case the court held:

The settled construction of the disputes clause excludes breach of contract claims from its coverage, whether for purposes of granting relief or for purposes of making findings of fact that would be reviewable under Wunderlich Act standards rather than *de novo*. [384 U.S. at 412 (86 S.Ct. at 1555)]

However, in treating with Part B. of this Claim No. 3, that is, the actual cost of restoring the foundations, and in dealing with Claim No. 4, hereinafter (plaintiff's claim for time extensions attributable to foundation failure), the Board necessarily made findings which were common to those claims, and to this claim for delay-damages (Part A., Claim No. 3), which it dismissed for want of jurisdiction. This was a circumstance which was predicted by the *Utah* decision

above quoted, and the impact of the findings common to both types of claims is later covered in the discussion of plaintiff's de novo claim for breach of contract predicated on these facts and seeking damages for these delays.

Turning to Claim No. 3, Part B., as to which the Board did assume jurisdiction, its decision observed that the specifications for this contract "were actually an adaption of specifications previously prepared for another 500-bed hospital at Ann Arbor, Michigan, for which a contract was awarded to J. D. Hedin Construction Company on August 24, 1949. * * * A comparison of the specifications for both projects shows that the same types of piles specified for Ann Arbor were also specified in the Chicago contract in identical language (Sec. 2–6). * * * A provision for coring as an aid to penetration in the Ann Arbor contract was deleted in its entirety from the Chicago specifications. In all other material respects the Ann Arbor and Chicago specifications were virtually identical."

There then follows an exhaustive analysis of the detailed specifications for both the pedestal and the later substituted composite-type foundation piles; the historical facts taken from the record relating to the difficulties encountered; the failure of the foundation; the request for instructions; the instructions to continue in the same manner as before; the increased damage that resulted therefrom; the delays; and, finally, the restoration instructions issued. These facts have been summarized earlier in this opinion and are not repeated here. But the Board's decision contains some additional recitations of interest.

For example, there is quoted the conclusion contained in a six-volume report by three prominent engineering firms engaged by plaintiff to ascertain the cause of the foundation difficulties. Their conclusion was:

The selection by the Government of a composite cast-in-place concrete pile after the results of the first series of test piles were available constituted the exercise of poor engineering judgment and the unsatisfactory results now being experienced were reasonably foreseeable.

There is also quoted the report of a special consultant employed by the Government, the costs of whose services have been back-charged to this plaintiff (Claim No. 5). His report reads in part as follows:

The conclusion drawn from the analysis outlined above is that overload ratios in the soil mass down to the bottom of the soft clay were in the critical range as a matter of general excavation practice. When these conditions were combined with the driving of piles which necessarily required heavy volume displacement, the resulting mass movement and drifting of piles and pile groups was inevitable under the sequence of operations employed.

Another Government expert previously mentioned, Dr. Feld, testified that in all but a few areas he considered appellant's claims for restoration work a reasonable representation of necessary costs.

On the basis of its excellent and comprehensive analysis of the record, the Board in its 1967 decision concluded that "the parties are in fundamental dispute as to the type of contract into which they entered and their respective rights and responsibilities under its terms." It observes that "the Government has always contended that Appellant contracted to produce the ultimate design objective by application of its own skills and by construction methods of its own choice, subject only to minimum standards prescribed for quality and workmanship," whereas "Appellant has as consistently contended that the specifications so controlled and governed its piling operations that the Government must be held to have impliedly warranted their suitability for production of a satisfactory foundation."

After a discussion of the specifications and the contentions of the parties the Board concluded:

> * * * *Both the original specifications and the even more detailed specifications embodied in the Change Authorization were in our opinion design specifications for which the Government must be held to have assumed complete responsibility.* [Emphasis added.]

Previous reference has been made to the virtually identical specifications employed for a similar hospital at Ann Arbor, Michigan, and constructed by J. D. Hedin Construction Company. That contract was also the subject of litigation in this court, and the Board's decision in this case concludes that "the basic issue has been effectively settled in Appellant's favor by the decision of the Court of Claims in J. D. Hedin Construction Company, Inc. v. United States, 171 Ct.Cl. 70, 347 F.2d 235, decided June 11, 1965. In that case the Court considered a contractor's claim for delay damages which arose from the very same Ann Arbor piling specifications from which the Chicago specifications were adapted. Specifications for the two projects were prepared in the same year by the same Veterans Administration designers and are so nearly identical in all material respects that we regard the Court's interpretation of one as a controlling precedent for our interpretation of the other. The principal differences between the specifications were the elimination of a provision for precoring in the Chicago contract which was included in the specifications for Ann Arbor * * *." Continuing its analysis of *Hedin*, the Board stated:

> In *Hedin*, the contractor sought damages for delays, occasioned by the Government's faulty specifications and its tardiness in correcting errors. The Court found that the specified thin-shelled piles with .05 inch walls could not withstand pressures exerted from the driving of subsequent piles, thus necessitating a change to heavy steel pipe piles with one-quarter inch walls. The Court held that this difficulty was directly attributable to the Government's failure to evaluate known subsurface conditions properly in specifying the original thin-shelled piles. The Court further held that the Government, by exercising its presumed expertise in preparing the specifications, impliedly warranted that satisfactory performance would result. The Court then ruled that the error in the specifications established a predicate for a breach of the Government's implied warranty for which the contractor was entitled to recover damages.

The Board's opinion then quotes extensively from the opinion of this court in *Hedin*, as follows:

> It is well settled that where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result. *E. g.*, United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Laburnum Construction Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963); Arcole Midwest Corp. v. United States, 113 F.Supp. 278, 125 Ct.Cl. 818 (1953); Stapleton Construction Co. v. United States, 92 Ct.Cl. 551 (1940). This rule rests on the presumed expertise of the government where it sees fit to prescribe detailed specifications. National Presto Industries, Inc. v. United States, [338 F.2d 99, 105, 167 Ct.Cl. 749, cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965)]. "This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance." United States v. Spearin, *supra*, 248 U.S. at 137, 39 S.Ct. at 61 (Court footnotes omitted). Moreover, this im-

plied warranty is not defeated by a contract clause permitting the prospective bidders to conduct independent subsurface investigations, if such explorations could not reasonably be completed before the bids were to be submitted. Fehlhaber Corp. v. United States, 151 F.Supp. 817, 138 Ct.Cl. 571, cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957). However, an experienced contractor cannot rely on government prepared specifications where, on the basis of the government furnished data, he knows or should have known that the prepared specifications could not produce the desired result for " * * * he has no right to make a useless thing and charge the customer for it." R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 286, 124 Ct.Cl. 681, 683 (1953). Cf., Flippin Materials Co. v. United States, 312 F.2d 408, 160 Ct.Cl. 357 (1963). If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover delay damages for defendant's breach of its implied warranty, and this breach cannot be cured by the simple expedient of extending the time of performance. Litchfield Mfg. Corp. v. United States, * * * [338 F.2d 94, 95, 167 Ct.Cl. 604, 607 (1964)] * * * The difficulties encountered did not stem from unknown subsurface conditions, *but* were directly attributable to defendant's failure to properly evaluate the known subsurface conditions in designing the specifications for the piles. Here the government chose to exercise its presumed expertise and thus impliedly warranted that satisfactory performance would result. As we said before, the thin-shelled piles originally selected for this project proved to be unsatisfactory since they could not be driven properly. This constitutes an error in the specifications which establishes a predicate for a breach of the government's implied warranty. Morrison-Knudsen Co. v. United

States, 345 F.2d 833, 170 Ct.Cl. 712, decided May 14, 1965. [347 F.2d at 241, 244, 171 Ct.Cl. at 76–77, 82].

Applying that holding to this case, the Board opinion continues:

The conclusion is inescapable that the provisions of Paragraph 2–5 in Appellant's contract, purporting to require the contractor to do something in addition to that which had been specified, do not operate to shift from the Government its responsibility for error in the design it has specified.

On authority of the *Hedin* case we hold that the Chicago piling specifications, both in their original form and as amended by Change Authorization No. 1, were design specifications which implicitly warranted that installation of the specified piles by the specified methods would produce a satisfactory foundation.

Appellant contends that the defect in this case which established a breach of warranty was the Government's specification of high-capacity displacement piles for Building No. 1 in such heavy concentrations that damaging mass movements of the incompressible clay soils were inevitable and inherent in the design. Appellant further contends there was nothing in the specifications to warn bidders that serious movements might occur, nor any provision for methods to prevent movements or to control them if they should occur. Appellant states it was justified in assuming the design was workable, that it performed its work strictly in accordance with the plans and specifications, and is therefore in no way responsible for damages which resulted from its execution of the Government's design.

The Government contends that the design, was entirely workable and that Appellant's increased costs of performance were the direct result of its own faults and failures in execution of the design. It states that displacement of soils by the driving of piles was well-known in the industry at the time of bidding and that standard

methods of controlling such displacements were practiced by competent pile-driving contractors. The Government contends that the difficulties Appellant encountered were the consequences of its failure to employ such controls and its failure to keep a close watch on the work as it progressed.

The Board evaluated these contentions, and considered in great detail every alternative plaintiff might have adopted to avoid the impact of this defective design. Noting that "the parties agree that soil conditions indicated by the borings are typical of conditions found generally in the Chicago area," the Board, relying on expert testimony, made the following factual findings:

1. Soil conditions at the site were represented with substantial accuracy by the boring information furnished to bidders * * *. Changed conditions were not encountered on this project.

2. The 30-odd feet of soil overlying the bearing stratum is a saturated cohesive clay technically regarded as a plastic solid. A material is plastic if its form is permanently altered by stress exceeding its limit of perfect elasticity. If the material will sustain a certain amount of stress before entering a condition of progressive displacement, it is a plastic solid * * *.

3. The bearing stratum is a compact sandy silt of varying degrees of strength and resistance at different locations and elevations as indicated by blows recorded on the sampler spoon * * *.

4. Both the plastic clay overburden and the compact clay bearing stratum are relatively incompressible. A pile driven into the plastic clay will· displace an amount of soil nearly equal to its own volume * * *. The movements which took place on this project occurred in the bearing stratum as well as in the plastic clay overburden * * *.

5. Pressures generated by volume displacements of these soils during pile driving operations are progressive and cumulative. At some threshhold [sic] point motions of the soil become disproportionately large as volumetric displacement increases. On this project the evidence indicates that serious movements of the piles took place wherever the cross-sectional area of a group of piles exceeded 2% of the foundation area in which they were driven. * * *

From all of the evidence, the Board concluded that "neither the Government nor Appellant had any conception that either the original or the changed design plan would produce disastrous mass movements. * * * It is evident that the Government did not anticipate that heave would be a serious problem because all of the three originally specified types, and the composite pile as well, were incapable of being redriven after they were filled with concrete * * * and Paragraph 2–9 of the specifications, requiring that upon completion of a cluster and inspection by the Superintendent it was to be filled with concrete, effectively precluded correction by redriving of heave that might occur any appreciable time after driving of the particular cluster was completed."

The Board further found that while "wood and cast-in-place concrete piles had been used for many years in Chicago, * * * prior to the 1940's they were usually limited to working loads of 25 tons for wood and 30 tons for concrete," and "with those piles heave had caused no serious problems * * *"; that while "in 1946, cast-in-place concrete piles of 65-ton capacity were driven without difficulty for the Donnelly Press building in Chicago, * * * there the concentration was one pile for every 42 square feet of foundation area * * *" [as opposed to 30 square feet for the West Side Hospital], and "the Donnelly piles were installed with long pipe sections of smaller diameter than the relatively short upper shell sections,

whereas the shell sections of the West Side Hospital piles averaged over twice as long as the pipe sections * * * "; and that the only cited instance where 40-ton or greater capacity piles had been placed in the Chicago area in concentrations greater than one pile for every 30 square feet involved the Garrick Theater building, constructed in 1892, whose reported 55-ton capacity piles would be rated today at only 25 to 30 tons, and which eventually settled 2¼ inches, damaging adjoining buildings. From these and other related findings, the Board concluded that "there was no precedent in Chicago for the particular foundation design the Government selected for installation at the West Side Hospital."

Moreover, on the basis of findings to the effect that "Chicago caissons [excavated shafts filled with concrete extending to rock or hardpan] have been used as foundations for large Chicago buildings since the turn of the century * * * ," and are, along with H-piles, "still the predominate foundation types for Chicago buildings of substantial size, due largely to experience gained from the displacement pile difficulties of 1950 * * * "; and that "during performance of the West Side Hospital piling work, and while the difficulties were being experienced, the Government issued invitations for bids for a Regional Office building to be constructed on an adjoining location," the plans for which, while calling for concentrations averaging approximately one 40-ton pile for each 45 square feet, "warned bidders that vertical and horizontal movements might occur, * * * placed responsibility on the contractor for use of construction methods to accomplish the ultimate results," and "provided for various controls, including a limitation of eight feet on excavation before all piles were driven, use of telltales to detect heave, reseating for heave before concreting, and reinforcement of piles with steel bars"; the Board concluded that "the foundation specified by the Government for Building No. 1 *could not have been*

*installed successfully by any contractor by the methods and procedures set out in the specifications and the use of the usual methods employed in the trade as ordinary incidents of normal pile driving practice.*" [Emphasis added.]

Further considering other possible methods of control which plaintiff might possibly have employed, even though not specified nor contemplated, the Board concluded that driving of piles prior to general excavation was not feasible, because excavation after piles were in place was slow and expensive and involved much hand labor, because there is evidence that the bearing values of piles may be affected by excavating around them after they are driven, and because test piles driven through a considerable depth of overburden that is later to be removed, afford an uncertain indication of what actual bearing capacity might later result. In any event, the Board observes in its scrupulous consideration of every possible Government contention, that "[w]hatever merit the Government's contention regarding excavation may have had with respect to the original specifications has no application to the amended specifications which became effective on March 7, 1950, for all of the excavation for Building No. 1 was completed two months earlier on January 9. The excavation lay open when the Government decided to substitute the composite pile and only the precoring technique remained as a possible means of avoiding volume displacements. * * * There is no evidence that either party at that time realized damaging movements might occur or that either believed special methods of control would be necessary. * * * Any responsibility for special measures to cope with the possible effects of the existing open excavation rested with the Government, in our opinion, as part of the design responsibility it had assumed."

As for precoring, the Board found that "[t]he evidence does not support the Government's contention that precoring was a standard method of volume

control commonly employed by contractors in 1949 and 1950. The few examples mentioned in the testimony show that precoring for that purpose was known in principle and had been tried experimentally but had never been perfected or adopted as a standard construction technique * * *. Prior to 1950 precoring had never been practiced in Chicago."

On the precoring requirement generally, the Board observed:

> Precoring as an aid to penetration, as specified in the Ann Arbor contract, was a common method of punching or drilling a hole through hard obstructions to enable a pile to reach the bearing stratum. * * * The fact that such a provision was deleted after first appearing in the Chicago Specifications was a circumstance directly related to design evaluation of the subsurface conditions to be encountered, and it afforded, in our opinion, a significant indication of the scope of the Government's undertaking to provide specifications as to the methods of installation to be employed by the contractor. * * * The action of the Government in omitting any precoring provision would, under the circumstances, have reasonably led bidders to believe that the possibility of need for precoring for any purpose had been considered and rejected by the designers, and that the design being furnished would not require precoring for the subsurface conditions to be encountered. * * *
>
> * * * * * *
>
> We conclude that precoring as a standard and effective method of volume control was beyond the state of the art in 1950. It was not a procedure contractors could have been expected to include in their bids in the absence of a specified requirement.

The Board then summarized its findings on this claim as follows:

> * * * No one anticipated the intensity and cumulative effect of displacement pressures that were later experienced. It was not until the damage was done that soils scientists analyzed the results to establish the cause. Appellant cannot be charged with foresight greater than the design engineers themselves possessed.

We find on authority of *Hedin* that Appellant was entitled to rely on the accuracy and suitability of the Government's specifications and on the engineering data it furnished bidders. The Government directed that the foundation be constructed in a specified way and must stand responsible for the results of its plan. Spearin v. United States, 51 Ct.Cl. 155, affirmed 248 U.S. 132, 136 [39 S.Ct. 59, 63 L. Ed. 166].

* * * * * *

From Appellant's point of view it had called the pile movement problem to the attention of the Government and had repeatedly asked for instructions but had received nothing but suggestions and advice to continue driving. With the work already far behind schedule because of testing delays and with the prospects of future movement unknown and unascertainable without investigation by soil experts Appellant was entitled to receive instructions from the Government and had no duty to stop the job and have an investigation made of the cause of the difficulty and evaluation of future effects. The Government having been notified that the design was in jeopardy because of subsurface conditions and effects was obligated to determine the existing conditions and if necessary revise the contract plans. * * * [Citing *Hedin*.] The Government's decision was to allow Appellant to drive out the remaining 366 piles without any change in methods and without any controls other than the continuation of surveys. The result was that the damage resulting from the design error that had been committed in specifying a displacement type foundation continued in such cumulative fashion as to greatly increase, and possibly surpass, the

damage that had existed when the movements were discovered and made known to the Government on June 24, 1950. We conclude that the Government is financially responsible for the costs of correcting the damage that resulted from failure of the specified design.

\* \* \* \* \* \*

\* \* \* Appellant['s] \* \* \* claims for corrective and restorative work performed in accordance with the Contracting Officer's demand letter of September 26, 1950 and subsequent directives \* \* \* are presented on the theory that the required work was not Appellant's contractual responsibility and is therefore subject to equitable adjustment under clause 3 as a change to the contract constructively ordered by the Government.

The doctrine of constructive change has been developed by appeals boards over the past two decades as a means of affording administrative relief to contractors who are required to perform work differing from that originally specified without benefit of formal change authorization or promise of payment. \* \* \*

The doctrine has received judicial recognition in Morrison-Knudsen, Inc. v. United States, 170 Ct.Cl. 753 [757], 763, note 2, 345 F.2d 833, 837 (1965); C. W. Schmid v. United States, 173 Ct.Cl. 302, 351 F.2d 651, 654 (1965), and was recently applied by this Board in M. Williams & Sons, Inc. VACAB–546, 66–2 BCA 5988. We find it applicable to the present claims for costs of foundation restoration work and will apply the standard of reasonable costs as the measure of the monetary adjustments. Bruce Constr. Co. v. U. S., 163 Ct.Cl. 97, 324 F.2d 516 [(1963)].

Thereafter, utilizing these equitable adjustment standards, and the testimony of Dr. Feld, the previously mentioned cost consultant for the Government, the Board concluded that plaintiff was entitled to recover on behalf of MacArthur and of itself, an equitable adjustment totaling $413,943.82 for the foundation restoration work. This included $279,-409.81 for MacArthur's direct costs ("actual costs incurred in performing the restoration work that have not been shown to be unreasonable or erroneous"); $58,676.06 for MacArthur's overhead (computed at 10 percent of direct costs) and profit (10 percent of the total of MacArthur's direct costs and overhead); $25,356.44 prime contractor's fee (7½ percent of the total of MacArthur's direct costs, overhead and profit "in accordance with general industry practice"); and $50,501.51 for Simmons' direct costs ($41,736.78), overhead (10 percent of direct costs) and profit (10 percent of the total of direct costs and overhead). The Board declined to compute MacArthur's overhead on a per diem basis, as appellant requested, noting that while such a "formula has been approved in the *Hedin* decision and other cases cited therein as one method of computing damages attributable to breaches of contract," it was inappropriate in this case, since "the claim is being considered under the constructive change doctrine which provides for an equitable adjustment for increased costs of performance" and "on its other claims MacArthur computes its increased costs by applying overhead of 10|% to direct costs and profit of 10% to the total of direct costs and overhead. This appears to be standard industry practice for the type of work involved \* \* \*." The Board also noted that while "Appellant performed the restorative work under trying conditions, \* \* this was also the case" with respect to other work which was the subject of claims in which a per diem computation was not requested; that during some of the days claimed appellant "was awaiting instructions for future operations," and performed only a limited amount of restorative work; and that it was unconvinced by appellant's contentions with respect to the percentage of MacArthur's general overhead chargeable to the subject project.

Finally, the Board concluded that "[s]ince we have found the Government responsible for the foundation failure, Appellant is entitled to a refund of $43,096.98," the sum previously mentioned as having been deducted from amounts otherwise earned by plaintiff, to cover alleged expense incurred by defendant in providing the corrective foundation designs.

As previously stated, related claims for delay-damages (Claim No. 3, Part A.), resulting from the foundation failure, and totaling $814,859.10 as summarized in the Board's opinion, were dismissed for want of jurisdiction. These claims will be later dealt with in this opinion as claims for breach of contract.

*Claim No. 4—Time Extensions Properly Assignable to the Foundation Failure*

As the Board correctly observes "[t]he Contracting Officer's allowance of time extensions totaling 534 calendar days eliminated all liquidated damages but was not acceptable to Appellant because of the basis on which the extensions were granted. It was and still is Appellant's position that 366 of those days should have been granted for causes arising from the foundation difficulties."

After analysis, the Board allowed 54 calendar days for the test pile program (Claim No. 1); 11 additional calendar days for performance of Change Order 4–G (Claim No. 2); 53 calendar days for the period August 4 through September 25, 1950, when the job was at a veritable standstill awaiting restoration instructions; and 233 calendar days for actual performance of the restoration work, for a total of 351 calendar days. The Board opinion further observes that "[w]e take no action to change the Contracting Officer's allowance of 534 calendar days for other changes since they covered the entire period from original completion date to the date of final acceptance and are legally supportable on that basis. Sun Shipbuilding Co. v. U. S., 76 Ct.Cl. 154; Standard Steel Car Co. v. U. S., 67 Ct.Cl. 445; 30 Comp. Gen. 230; 152 A.L.R. 1357–59."

*Claim No. 5—Deduction by Contracting Officer of $6,500 (Reduced by 1959 Board Decision to $5,104.61) for Engineering Services Allegedly Paid Private Consultant in Overcoming Pile Movement Problem*

In its 1967 decision, the Board held:

Although Appeals Case No. 125 is not officially before us it is our opinion that the sum of $5,104.61 there withheld should also be refunded.

After the filing by plaintiff of his first amended petition, July 27, 1967 (in an effort to secure payment in accordance with the above summarized Board decision), defendant in its answer admitted that plaintiff was entitled to payment on one item of that decision, namely, the amount of $136,835.14 representing the additional allowance under Change Order 4–G. That has been designated as Claim No. 2 in the foregoing analysis of the Board's decision. Accordingly, plaintiff moved for partial summary judgment in that amount, there was no objection, and by order filed September 15, 1967, judgment was entered on that item of the Board's decision, without prejudice of plaintiff's right to pursue the balance of the claims set forth in plaintiff's first amended petition.

Additional concessions by defendant's counsel are reflected in the pleadings and briefs. In his answer to the first amended petition and his brief, counsel for defendant acknowledges that the Veterans' Administration Board's decision is correct as to its findings of fact. Moreover, he now agrees in his brief that the Board's decision with respect to Claim No. 1, Additional Test Piles and Testing, is correct and that plaintiff is entitled to payment thereon. The Board's decision with respect to Claim No. 2, Additional Work Under Change Order 4–G, has previously been admitted, and judgment entered thereon, as above noted.

With respect to the matters decided by the 1967 Board that leaves only Claims designated Nos. 3, 4, and 5, all

relating to the sufficiency of the specifications and the responsibility for the failure of the foundation. The Board's decision has hereinabove been summarized and quoted at considerable length. It is, as demonstrated by an examination of that comprehensive decision, a decision which is manifestly correct and fully supported by the case law.

Plaintiff is entitled to judgment not only on Claim No. 1 in the amount of $18,811.02, as to which there is no opposition, but also on Claim No. 3, Part B. in the amount of $413,943.82 for the cost of restoring the foundation, as found in the Board decision. Plaintiff is further entitled under Claim No. 3, Part B., to judgment in the amount of $43,096.98, that being the amount found by the Board to have been wrongfully withheld from plaintiff on the erroneous theory that plaintiff was responsible for the foundation failure. Plaintiff is further entitled to judgment in the sum of $5,-104.61 on Claim No. 5, the additional sum found by the Board to have been wrongfully withheld on the erroneous theory that plaintiff, and not defendant, was responsible for the foundation failure. These two withholdings are the subject matter of a counterclaim by defendant which should, accordingly, be dismissed for purposes of the record.

RECAPITULATION AS TO THE CLAIMS COVERED BY THE VETERANS' ADMINISTRATION BOARD'S 1967 DECISION

Claim No. 1—Judgment for plaintiff —$18,811.02 (no opposition).

Claim No. 2—Judgment for plaintiff— $136,835.14 (no opposition—judgment entered September 15, 1967).

Claim No. 3—Part A. Board disclaimed jurisdiction; this part covered later in this opinion, as a breach of contract claim. Part B. Judgment for plaintiff—$413,943.-82; (withheld)—$43,096.98; As found by the Board—$457,040.80.

Claim No. 4—Covered later in this opinion, in connection with breach of contract claim.

Claim No. 5—Judgment for plaintiff— $5,104.61 (withheld)—As found by the Board.

Total additional entry of judgment for plaintiff—$480,956.43.

As requested by plaintiff, and as provided heretofore in the September 15, 1967 order entering judgment on Claim No. 2, the entry of such judgment, and its payment, should not prejudice plaintiff's rights to pursue the balance of its claims set forth in plaintiff's first amended petition.

THE BREACH OF CONTRACT CLAIMS

Claim No. 3, Part A.—Delay—Damages Resulting From the Foundation Failure

■ This is the claim, it will be recalled, as to which the Board disclaimed jurisdiction. After a most comprehensive discussion of the facts and of the law relating to the nature of the specifications, and the responsibility for their adequacy, the Board concluded that the delay-damages claim growing out of the foundation failure was in the nature of a claim for unliquidated damages for breach of contract, rather than for relief under its terms, and "we make no findings and dismiss the claims for lack of jurisdiction in accordance with the decision of the Supreme Court in [United States] Utah Construction and Mining Company, 384 U.S. 394 [86 S.Ct. 1545, 16 L.Ed.2d 642], decided June 6, 1966."

In stating that "we make no findings" the Board was obviously referring to ultimate findings with respect to liability, since it had theretofore set forth a most detailed findings of fact and discussion of the law in connection with the allowance by the Board of closely related Claim No. 3, Part B. above, dealing with the direct cost of restoring the defective foundation. Moreover, in Claim No. 4,

as above designated, the Board had dealt in detail with the time extensions to which the plaintiff was entitled by reason of the foundation failure, with the contracting officer's directive to proceed in accordance with the defective specifications, with the delay in issuing instructions when the foundation failure occurred, and with the time consumed in performing the corrective work. The *Utah* decision cited by the Board, in dealing with a remarkably similar circumstance, held that:

> * * * Although the Board lacked authority to consider delay damages under these two claims, it did have authority to consider the requests for extensions of time under Articles 4 and 9,[14] and these requests called for an administrative determination of the facts. Such findings, if they otherwise satisfy the standards of the Wunderlich Act, are conclusive on the parties, not only with respect to the Articles 4 and 9 claims but also in the court suit for breach of contract and delay damages. * * * There is no room in the language of Article 15 or of the Act to consider factual findings final for some purposes but not for others. * * * 384 U.S. at 418–419, 86 S.Ct. at 1558.

Even more relevant to this case, is the fact that the Board's findings have now achieved the stature of an admission or stipulation, because they have been made by defendant, and have been acknowledged as factually correct by defendant's counsel. On the basis of these established facts, the law discussed in the Board decision, and the additional citations to authority in its briefs,[15] plaintiff urges that the Board has "made conclusive findings as to the cause and extent of the delays experienced by plaintiff in the performance and completion of the work, which findings establish that such delays were the result of the faulty foundation design specified by defendant, and upon the basis of which findings defendant is liable, as a matter of law, for the damages incurred by plaintiff and its subcontractors as a consequence of such delays." Plaintiff further asks that the exact amount of such delay costs and expenses "be determined by further proceedings pursuant to Rules 47(c) (2) and 64(e)."

Plaintiff's position on this claim is manifestly correct. The Board, in reaching the very same conclusions as to responsibility for the foundation failure when dealing with the claim which it could decide (Claim No. 3, Part B.), relied heavily on the *Hedin* decision [16] of this court, quoted earlier in this opinion. In so doing, the Board had the benefit of a case almost literally "on all fours," involving as it did the same agency, the same contract provisions, and substantially the same factual and legal premises. As in *Hedin,* the Board found that soil conditions at the site were represented with substantial accuracy by the boring information, and that changed conditions were not encountered on this project; that there was no precedent in Chicago for the particular foundation design selected by defendant; that the specified foundation could not have been

---

14. In our case, the Board had the additional authority to consider the claim for the direct cost of restoring the defective foundation (Claim No. 3, Part B.).

15. *Spearin,* note 4 *supra; Luria Bros. & Co.,* note 4 *supra;* Hol-Gar Mfg. Corp., note 3 *supra;* J. D. Hedin Const. Co., note 4 *supra;* Morrison-Knudsen Co. v. United States, 345 F.2d 535, 170 Ct.Cl. 712 (1965); Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 167 Ct.Cl. 604 (1964); National Presto Indus., Inc. v. United States, 338 F.2d 99, 167 Ct.Cl. 749 (1964), cert. denied, 380 U.S. 962,

85 S.Ct. 1105, 14 L.Ed.2d 153 (1965); Laburnum Const. Corp., note 4 *supra;* Fehlhaber Corp. v. United States, 151 F. Supp. 817, 138 Ct.Cl. 571, cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957); Arcole Midwest Corp. v. United States, 113 F.Supp. 278, 125 Ct.Cl. 818 (1953); R. M. Hollingshead, note 4 *supra;* Warren Bros. Roads Co. v. United States, 105 F.Supp. 826, 830, 123 Ct.Cl. 48, 82 (1952); Stapleton Const. Co., note 4 *supra;* Steel Products Engineering Co., note 4 *supra.*

16. Note 4 *supra.*

installed successfully by any contractor by the methods and procedures prescribed by defendant and the use of the usual methods employed in the trade as ordinary incidents of normal pile driving practice; and that the failure of the foundation was due to defendant's improper design and was not attributable to any failure on the part of the plaintiff and its piling subcontractor to perform the work in accordance with the specifications, nor to poor workmanship, nor to any failure by plaintiff and its piling subcontractor.

■ These factual premises are sufficient to invoke the now historical rule enunciated in a host of cases, some of which are cited in footnote 15 herein. As stated by this court in the *Spearin* case,[17] prior to its affirmance by the Supreme Court:

> * * * If the defendants had failed in the plans and specifications provided by them for the dry dock proper, and the contractor in following them could not have completed a work they were designed to accomplish, surely the responsibility for the failure would not rest upon him. The contractor is obligated to do what the plans and specifications direct him to do, and when he has done so in a good and workmanlike manner he has discharged his responsibility under the contract. If the plans and specifications are deficient, if they are inadequate and structurally wrong, it is the fault of the parties proposing them and not the contractor executing the same. The judgment and skill of the contractor is relied upon by the defendants to the extent only of executing the plans as they design them. * * * 51 Ct.Cl. at 171.

As to defendant's contention that plaintiff is entitled only to time extensions, the opinion of this court in *Laburnum* [18] furnishes the reply:

> * * * If faulty specifications prevent or delay completion of the con-

tract, the contractor is entitled to recover damages for the defendant's breach of its implied warranty. [Citing cases.] Those damages extend to the costs incurred by reason of the idleness resulting from the mistakes in the plans. The defendant cannot, by errors in the specifications, cause delay in plaintiff's completion of the work and then compensate plaintiff merely by extending its performance time and by payment of any added direct cost occasioned by changes to correct those errors.

Defendant relies on the rule of the *Rice* [United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53], *Blair* [United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039] and *Foley* [United States v. Howard P. Foley Co., 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44] cases in which the Supreme Court relieved the Government of liability for the cost of the contractor's idleness during periods of delay. In those cases, however, the delay was caused by contractors or other factors outside the Government's control, and the Court so found. This exculpatory rule is not applicable to a situation in which unreasonable delays were the result of defendant's failure to promulgate properly drawn specifications or otherwise the fault of the Government. We have made this distinction before (*see, e. g.,* Kehm Corp. v. United States, 83 F.Supp. 620, 119 Ct.Cl. 454 (1950)), and we adhere to it now. 325 F.2d at 457–458, 163 Ct. Cl. at 350.

In its reply brief, defendant relies on a relatively recent decision of this court, Jefferson Const. Co. v. United States, 392 F.2d 1006, 183 Ct.Cl. 720, cert. denied, 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed. 2d 113 (1968), to suggest that the long-established rule holding that the Government warrants the sufficiency of its design specifications, does not apply unless the Government was independently

17. 51 Ct.Cl. 155 (1916), aff'd 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

18. Note 4 *supra.*

at fault or negligent in their preparation. Aside from the fact that such independent fault or negligence is liberally suggested in this record when one considers the Government's knowledge of subsurface conditions, its use of an experimental design in this area, and its insistence on adhering to that design after clear evidence of damage had appeared, the "Spearin" rule is not dependent on a finding of independent fault or negligence. The "Spearin" rule originates and is inherent in the Government's undertaking to prepare adequate plans and specifications. This is apparent from a reading of the many cases cited in support of the rule.[19] *Jefferson*, on the other hand, was decided on the basis of the "Changed Conditions" article in that contract, and that called for the fixing of an equitable adjustment under that article, as defined in a long line of cases dealing therewith. It is readily distinguishable from the "Spearin" rule dealing with damages for breach of the implied warranty of the sufficiency of specifications.[20] As stated in *North Am. Philips Co.*, note 4 *supra*, 358 F.2d at 985–986, 175 Ct.Cl. at 80:

> * * * As the ultimate specifications, the ARF drawings became subject to the rule that the Government implicitly represents that if its specifications are complied with, satisfactory performance will result. [Citing cases.] This warranty was breached, and recovery is therefore mandatory in this instance.

While it is true that no duplicity was involved on defendant's part in requiring the material change in Modification 3 (defendant presuming the drawings were fairly correct) defendant being the procurer and supplier of the drawings must bear the responsibility for the damages that resulted from the change in requirements. This rule is no harsher than construing an ambiguous contract against the party that drew it, and in

fact is somewhat parallel. The fact that defendant presumed the drawings to be useful in production does not alter its warranty, as presumably in all contracts, defendant at the outset believes its specifications to be accurate.

It follows that plaintiff is entitled to judgment on this claim for delay-damages, the amount thereof to be determined in further proceedings pursuant to Rules 47(c) (2) and 64(e).

## CLAIM FOR INTEREST

Plaintiff in its first amended petition repeats prior allegations that the administrative procedures of the Veterans' Administration in its initial consideration of plaintiff's claims preceding its aforementioned decisions of February 20, 1959, and March 31, 1959, "were a travesty on administrative justice and fair play. Moreover the failure and refusal of the Veterans Administration to make payment for the additional costs to which it subjected plaintiff and its subcontractors, as set forth hereinbefore, and the procedures it resorted to to justify its refusal to make such payments as well as to justify its action in withholding from plaintiff and its subcontractor, MacArthur, monies which were otherwise due them, did not constitute acts of good faith, and were a taking of private property for public use without just compensation in violation of the Fifth Amendment to the Constitution of the United States." On these grounds, plaintiff claims interest "on the amounts claimed herein * * * at 6 percent per annum from April 30, 1953, when work under the contract was completed, or alternatively from February 20, 1959, and March 27, 1959, when the decisions of the earlier Board were issued."

It will also be recalled that although the contracting officer had found plaintiff entitled to time extensions, so that no liquidated damages were properly assessable against plaintiff, liquidated

---

19. Notes 4 and 15 *supra*.

20. *See* WRB Corp. v. United States, 183 Ct.Cl. 409 (1968).

damages in the amount of $164,250 were nevertheless withheld from February 12, 1954, until the Board rendered its first decision in February 1959. This fact plaintiff also alleges was "without justification and over plaintiff's protest. * * * The withholding of such amount by defendant not being in good faith also constituted a taking of plaintiff's property for public use without just compensation in violation of the Fifth Amendment." Plaintiff claims interest thereon from February 12, 1954, until that amount was refunded following issuance of the first Board decision in February 1959.

Plaintiff seeks a de novo trial on the facts offered in support of its claim for interest, and defendant responds with a motion for summary judgment thereon, citing various authorities prohibiting payment of interest.[21] Defendant further equates the allegations of bad faith with an action in tort, and cites authorities holding that this court has no original jurisdiction of such matters.[22] Finally, defendant for the first time in its reply brief, urges that this interest claim is barred by the 6-year statute of limitations. It alleges that this claim is based on events which occurred with the initial Board decision in 1959, at the latest, and this was more than 6 years prior to the filing of plaintiff's first amended petition on July 27, 1967.[23]

Plaintiff, in seeking a trial de novo on this claim, points out that it involves issues of fact not decided by the Board upon which the issues of law depend. The ex parte character of the procedures underlying the 1959 Board decision are already a matter of record and are not in dispute. As above indicated, the de-

ficiencies in the pre-1959 procedures of the Board are fully acknowledged in the Board's 1967 decision. They were in fact the basis for the order of this court returning the case to the Veterans' Administration to permit it to remedy the defects and inadequacies in the first record. The commissioner's order and memorandum opinion of June 4, 1965, confirmed on this point by the court's order of November 15, 1965, described these ex parte proceedings and concluded that the initial mode of proceeding upon plaintiff's appeals had deprived it of its right under the "Disputes" clause to a decision based upon evidence openly presented and with a meaningful opportunity for rebuttal.

However, plaintiff makes a substantial offer of additional proof on this issue, the offer consisting of material obtained in the course of discovery proceedings. Plaintiff alleges that an official of the Veterans' Administration who had assisted and advised the contracting officer in the formulation of the decisions giving rise to the dispute, had thereafter sat in judgment upon plaintiff's appeals to the head of the department. Plaintiff states it will present proof at a trial that this official counseled the contracting officer, after the foundation had failed, that plaintiff was required under the contract to correct the damage and provide a suitable foundation; that this official then sat as Chairman of the 1959 Board in deciding the appeal of the contracting officer's decision rendered 9 years earlier.

Furthermore, it is alleged that this official continued to advise and instruct the contracting officer while the project was proceeding to completion, and that while serving as Chairman of the Board,

21. 28 U.S.C. § 2516; United States v. Aleca Band of Tillamooks, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951); Feener Technical Schools, Inc. v. United States, 141 F.Supp. 777, 136 Ct.Cl. 94 (1956); Komatsu Mfg. Co. v. United States, 131 F.Supp. 949, 132 Ct.Cl. 314, 316 (1955).

22. Basso v. United States, 239 U.S. 602, 36 S.Ct. 226, 60 L.Ed. 462 (1916); Sou-

karas v. United States, 140 F.Supp. 797, 800, 135 Ct.Cl. 88, 93, cert. denied, 352 U.S. 918, 77 S.Ct. 214, 1 L.Ed.2d 122 (1956); Persful v. United States, 102 Ct. Cl. 232 (1944).

23. Citing Acme Process Equipment Co. v. United States, 347 F.2d 509, 538, 171 Ct.Cl. 324, 372 (1965); rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966).

he continued to advise and counsel the contracting officer in opposing the appeals; that he participated in the decision of the contracting officer to withhold the sum of $164,250 as liquidated damages during the pendency of the appeals, notwithstanding the contracting officer's decision that plaintiff was entitled to extensions of time and that no liquidated damages were therefore assessable.

It is further alleged that throughout the processing of the appeals, this official actively assisted and counseled the contracting officer and his staff, as well as expert witnesses retained by the Government to oppose the appeals, and advised and instructed the contracting officer as to the precise evidence that should be assembled by the Government in opposition to appellant's proof. It is charged that he further counseled with and advised the Government's expert witnesses concerning the preparation of their reports which he, as Chairman of the Board, then relied upon as a basis for denying plaintiff's appeals.

In summary, plaintiff asserts that the documentary evidence obtained on discovery establishes that while supposedly sitting as the tribunal for the determination of plaintiff's appeals, this official was in effect simultaneously serving as the Government's trial counsel and advocate.

Citing this offer of proof, together with the admitted facts relating to the denial to plaintiff of the right to confront and cross-examine these reports and the rest of the Government's case, plaintiff argues that it has long been recognized that interest should properly be allowed to effect just compensation as required by the fifth amendment[24] and that contracts are in fact property protected by the fifth amendment.[25] "The contract right which was taken in the present instance," plaintiff asserts, "was plaintiff's right to a fair and impartial consideration of its claims, in good faith, pursuant to the 'Disputes' clause of the contract."

Plaintiff in his reply brief further argues as follows:

It is elementary that a party before an administrative body where a hearing is required, as under the "Disputes" clause procedures, is entitled to a trial by a tribunal free from bias and prejudice, and imbued with the desire to accord the parties equal consideration. The Fifth Amendment requires that the tribunal must necessarily be free from all bias and partiality. The tribunal cannot be both judge and party, arbiter and advocate, in the same cause. [Inland Steel Co. v. National Labor Relations Board, 109 F.2d 9, 20, 7th Cir. (1940); National Labor Relations Board v. Phelps, 136 F.2d 562, 5th Cir. (1943)].

Further, citing Camero v. United States, 375 F.2d 777, 780–781, 179 Ct.Cl. 520, 526–527 (1967), plaintiff points out that an aggrieved party has been denied due process by an ex parte communication between the decision maker and the Government representative, particularly when that representative has actually participated in the decision-making process.[26] Plaintiff calls our attention to *Acme Process Equipment Co.*, note 23 *supra*, 347 F.2d 539, 171 Ct.Cl. at 370–372, to argue that "this Court has recognized that if the Government acts in bad faith in rejecting a contractor's claims,

24. Citing Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 306, 43 S. Ct. 354, 67 L.Ed. 664 (1923).

25. Citing Lynch v. United States, 292 U.S. 571, 577, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 119, 123, 44 S.Ct. 471, 68 L.Ed. 934 (1924); United States v. Northern Pac. Ry. Co., 256 U.S. 51, 64, 67, 41 S.Ct. 439, 65 L.Ed. 825 (1921);

United States v. Central Pac. R.R. Co., 118 U.S. 235, 240, 6 S.Ct. 1038, 30 L. Ed. 173 (1886); In re Sinking Fund Cases, 99 U.S. 700, 719, 724–725, 25 L. Ed. 496, 504 (1878).

26. Citing *Camero* upon an earlier consideration [345 F.2d 798, 170 Ct.Cl. 490 (1965)] of cross-motions for summary judgment.

the contractor could be entitled to just compensation under the Fifth Amendment, which would include the allowance of interest * * *. In that case the Court denied the claim for interest, but did so because the contractor there had failed to prove that the Government's actions on its claims had been taken in bad faith." Attention is also drawn to Ripley v. United States, 220 U.S. 491, 31 S.Ct. 478, 55 L.Ed. 557 (1911), and Ordinance Engineering Corp. v. United States, 68 Ct.Cl. 301, 335–336 (1929).

Plaintiff observes that the "Disputes" clause, and other provisions of the contract, bound plaintiff "to proceed with the work and to comply with instructions of the Veterans' Administration pending the determination of disputes, while foregoing its rights to refuse further performance if it considered such instructions unjustified." And it concludes therefrom:

> Plaintiff and its subcontractors proceeded in good faith in accordance with these undertakings assumed in the "Disputes" clause. In the course of thus faithfully performing their contract commitment, they expended large sums of money and, indeed, plaintiff's principal subcontractor, MacArthur Concrete Pile Corporation, after a successful business history of approximately 50 years, was totally destroyed by its efforts to comply with the Government's orders.

Plaintiff argues persuasively that in return for its undertaking to continue with the work while its dispute was being adjudicated, it acquired "a vested right to a fair, impartial, and good faith determination of its claims" and that the "reprehensible dual role" above described "must shock the conscience of anyone familiar with even the rudimentary concepts of good faith and fair dealings imbedded in our constitutional system."

It is recognized by plaintiff that "there is no specific precedent in the case law which has directed the payment of interest to effect just compensation under the Fifth Amendment in circumstances exactly similar to those present here. However, the decisions of the Supreme Court, this Court, and other courts referred to previously, furnish ample authority for the application of the protection of the Fifth Amendment here, and it is reasonable to conclude that the lack of any exact precedent for the circumstances involved in this case results, not because the Fifth Amendment is not applicable, but because the agencies of our Government do not normally conduct their business with the questionable morality that permeates the present case."

 Addressing ourselves to all of these arguments, it is concluded that plaintiff is entitled to prevail on the "statute of limitations" defense raised by defendant, but not upon the merits of its "claim for interest." Defendant's argument on the statute of limitations assumes that the claim for interest, as specified in the first amended petition states a new cause of action. But Rule 22(c) provides:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

The original petition, filed April 23, 1959, immediately after the first Board opinion, made detailed reference to the defective procedures which underpin this claim for interest, and introduced in general terms as a pleading requires, all of the facts which plaintifff now offers to prove in a de novo trial. In that original pleading, it complained of the lack of an opportunity to confront and cross-examine the Government's case.[27]

---

**27.** The legislative history of the Wunderlich Act recognizes that right of confrontation as essential in these words: " * * * It would not be possible to justify the retention of the finality clauses in Government contracts unless the hearing procedures were conducted in such a way as to require each party to present

Moreover, the original petition alleged these same operative facts to support the plea that the Board's original decision was not entitled to finality. These allegations are virtually repeated in the first amended petition. It is true that the first amended petition asserts a "taking," and claims interest as damages for the first time, but the taking is based on facts which have been a part of this proceeding since its inception.

The modern practice [28] is to lessen the perils of pleading by rejecting the "cause of action" approach in favor of one which focuses on the underlying facts of a claim for relief.

In Snoqualmie Tribe of Indians on its own behalf and on relation of the Skykomish Tribe of Indians v. United States, 372 F.2d 951, 178 Ct.Cl. 570 (1967), this court noted that the primary purpose of the statute of limitations is "to ensure that parties are given formal and seasonable notice that a claim is being asserted against them." The opinion observes that "notice is the test, and it is built-into the rule's requirement that the amended pleading arise out of the same 'conduct, transaction, or occurrence.' In other words, the inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading." 372 F.2d at 960, 178 Ct.Cl. at 587.

The initial attack on the Board's procedures was the very reason for the return of the case to the Board. It would be a return to the old "cause of action" approach to declare the claim time-barred because the original theory of relief was "changes" or breach of contract, and the consequences of those defective procedures are now characterized as a "taking."

Acme Process Equipment Co. v. United States, note 23 *supra*, is relied on by de-

fendant, but is distinguishable. There is no indication as to whether the operative facts relied upon in the amended petition in that case, were mentioned in the original petition, whereas in this case, the amended petition virtually repeats allegations of operative facts set forth in considerable detail in the original petition. *See also*, United States v. Northern Paiute Nation, 393 F.2d 786, 183 Ct.Cl. 321 (1968), and United States v. Templeton, 199 F.Supp. 179, 183 (E.D.Tenn. 1961).

Plaintiff also draws our attention to those cases [29] which hold that an increase in the damages claimed does not introduce a new cause of action, and to Nager Elec. Co. v. United States, 368 F.2d 847, 177 Ct.Cl. 234 (1966), holding that where a contractor has breach of contract claims as well as claims which are administratively redressable, the statute of limitations does not begin to run on the breach claims until the conclusion of the administrative action.

Plaintiff's claim for interest is not time-barred.

■ On the merits, plaintiff has a much more formidable burden in establishing that the facts alleged constitute a taking contrary to the fifth amendment. In order not to confront at this time the request for a de novo trial, this claim is considered not only on the facts of record, but on the assumption that all of the facts set forth in plaintiff's offer of proof are true.

Plaintiff is quite correct in asserting that such facts "must shock the conscience of any one familiar with even the rudimentary concepts of good faith and fair dealings imbedded in our constitutional system." Counsel's reference to the "questionable morality" of these procedures is reminiscent of the words of Mr. Justice Douglas in the *Bianchi* deci-

---

openly its side of the controversy and afford an opportunity of rebuttal." 2 U.S. Code Cong. & Ad.News, p. 2195 (1954).

**28.** *Cf.* Fed.R.Civ.P. 15(c).

**29.** Wm. T. Burton, Inc. v. Reed Roller Bit Co., 214 F.Supp. 84 (W.D.La.1963); Devlin v. United States, 12 Ct.Cl. 266, 273 (1876).

sion [30] and of his words and those of Mr. Justice Reed and Mr. Justice Jackson in the Wunderlich case.[31] But these words appear in dissents, and the majority in those cases exhibited a higher threshold of tolerance for the administrative procedures described, procedures which featured many of the same infirmities alleged in this case, as the dissents indicate.

The legislative history of the Wunderlich Act [32] quotes from a decision of this court [33] to the effect that: "Such a provision [the "Disputes" article] we had understood called for the highest good faith on the part of the interested party making the decision." It also quotes from the dissenting opinions in *Wunderlich* as follows:

Mr. Justice Douglas and Mr. Justice Reed: * * * But the rule we announce has wide application and a devastating effect. It makes a tyrant out of every contracting officer. He is granted the power of a tyrant even though he is stubborn, perverse or captious. * * * He has the power of life and death over a private business even though his decision is grossly erroneous. * * * We should allow the Court of Claims, the agency close to these disputes, to reverse an official whose conduct is plainly out of bounds whether he is fraudulent, perverse, captious, incompetent, or just palpably wrong. The rule we announce makes government oppressive. The rule the Court of Claims espouses gives a citizen justice even against his Government. 342 U.S. at 101–102, 72 S.Ct. at 156.

Mr. Justice Jackson: But one who undertakes to act as a judge in his own case, or what amounts to the same thing, in the case of his own department, should be under some fiduciary obligation to the position which he assumes. He is not at liberty to make arbitrary or reckless use of his power, nor to disregard evidence, nor to shield his department from consequences of its own blunders at the expense of contractors. * * * Though the contractor may have covenanted to be satisfied with what his adversary renders to him, it must be true that he who bargains to be made judge of his own cause assumes an implied obligation to do justice. This does not mean that every petty disagreement should be readjudged, but that the courts should hold the administrative officers to the old but vanishing standard of good faith and care.

I think that we should adhere to the rule that where the decision of the contracting officer or department head shows "such gross mistake as necessarily to imply bad faith" there is a judicial remedy even if it has its origin in overzeal for the department, negligence of the deciding official, misrepresentations—however innocent—by subordinates, prejudice against the contractor, or other causes that fall short of actual corruption. Men are more often bribed by their loyalties and ambition than by money. I still believe one should be allowed to have a judicial hearing before his business can be destroyed by administrative action, although the Court again thinks otherwise. 342 U.S. at 103, 72 S.Ct. at 157.

These thoughts are echoed in a very recent case of the Supreme Court [34] involving, not an administrative decision

---

30. Note 2 *supra*. "We are dealing, in other words, with subnormal administrative procedures." 373 U.S. at 721, 83 S.Ct. at 1417.

31. Note 10 *supra*.

32. Note 27 *supra* at 2193.

33. Palace Corp. v. United States, 110 F. Supp. 476, 478, 124 Ct.Cl. 545, 549, cert. denied, 346 U.S. 815, 74 S.Ct. 26, 98 L. Ed. 342 (1953).

34. Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968).

by the Government in a Government contract dispute, but an award by independently selected arbitrators. Speaking for the majority in that case, Mr. Justice Black stated:

> At issue in this case is the question whether elementary requirements of impartiality taken for granted in every judicial proceeding are suspended when the parties agree to resolve a dispute through arbitration. 393 U.S. at 145, 89 S.Ct. 337, 338.

Holding that they are not so suspended, the opinion observes:

> This rule of arbitration and this canon of judicial ethics rests on the premise that any tribunal permitted by law to try cases and controversies must not only be unbiased but must avoid even the appearance of bias. We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another. 393 U.S. at 150, 89 S.Ct. at 340.

Unfortunately for plaintiff in this case, his theory that subnormal administrative procedures can amount to a "taking," must be measured against the standards that prevailed at that time. Those standards are more authoritatively reflected by the majority in the *Wunderlich* and *Bianchi* decisions. Moreover, the Congress in enacting more liberal standards of judicial review in the Anti-Wunderlich Act, denied finality to an administrative decision which is fraudulent, capricious, arbitrary, grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In so doing, it inferred that the remedy was reversal of a decision guilty of those things, not that any of the enumerated deficiencies also laid the foundation for an action based on the fifth amendment.

The claim for interest could not be sustained if it were predicated solely on the Government's failure to pay money when it was due.[35] Recognizing this, plaintiff's counsel lays heavier emphasis on bad faith underlying the administrative procedures as equivalent to the taking of a contract right, which is undoubtedly a property right, and he cites the *Acme* case[36] as inferring that a finding of bad faith would have produced a different result in that case. But *Acme* did not hold that bad faith in the administrative procedures would constitute a taking contrary to the fifth amendment. It stated rather that "[w]e do not reach the issue of whether there would be a taking * * * if bad faith on the part of the defendant had been shown." 347 F.2d at 538 n. 43, 171 Ct.Cl. at 372 n. 43.

The cases are lacking to support a holding that the defective procedures described above constituted a taking,[37] and the inferences of *Wunderlich*, the Wunderlich Act, and *Bianchi* are to the contrary. Plaintiff is not entitled to prevail on this claim for interest.

### CLAIM FOR BOND PREMIUMS

In its original petition, plaintiff claimed "bond premium that will be owing to the surety in the amount of $6.67 per $1,000 * * *" and this is repeated in the first amended petition under the heading "Claim for Interest." There is no further discussion of this as a separate item in the briefs. Suffice it to say, that the claim characterizes bond premium as a percentage or product of contract payments. To the extent of the allowances represented by the 1967 decision of the Veterans' Administration

---

35. See cases cited in note 21 *supra*.

36. Note 23 *supra*.

37. *Cf.* Eastport S.S. Corp. v. United States, 372 F.2d 1002, 178 Ct.Cl. 599 (1967); Williamson v. United States, 166 Ct.Cl. 239 (1964); Kanarek v. United States, 314 F.2d 802, 161 Ct.Cl. 37 (1963).

# 1390

Board with which plaintiff finds no have been included in the equitable adjustments therein contained. As to the delay-damages claim allowed herein, fault, bond premium must be deemed to the amount of recovery, including bond premium if later found to be appropriate, has been deferred pending further proceedings under Rules 47(c) (2) and 64 (e). If it is suggested that bond premiums are in the nature of interest, as would appear from the heading in the first amended petition, bond premiums must fall with that interest claim. For the foregoing reasons, no separate and detailed treatment of the "bond premium" claim is required by this decision.

In view of the disposition of this case on the grounds stated above, we need not reach the question as to whether and to what extent the Government may challenge and obtain judicial review, under the Wunderlich Act, of a decision by a board of contract appeals, which is in favor of the contractor.

## CONCLUSION OF LAW

1. With respect to the claims covered by the Veterans' Administration Contract Appeals Board's decision of May 31, 1967, as recapitulated above, plaintiff's motion for partial summary judgment is granted, defendant's cross-motion is denied, and judgment is entered for plaintiff in the amount of $480,956.43.

2. With respect to the claim herein designated No. 3, Part A., "Delay-Damages Resulting from the Foundation Failure," plaintiff is entitled to recover, the amount of recovery to be determined in further proceedings pursuant to Rules 47(c) (2) and 64(e).

3. With respect to the claim for interest, the petition is dismissed.

4. With respect to the claim for bond premiums, the petition is dismissed, except to the extent that this item might be relevant in the above-mentioned proceedings under Rules 47(c) (2) and 64 (e).